FILED

JUL 08 2024

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

JAVIER CAZARES, Individually as Wrongful Death Beneficiary of J.J.C., *deceased minor*; SANTA GLORIA CAZARES, Individually as Wrongful Death Beneficiary and as Representative of the Estate of J.J.C., *deceased minor*; KIMBERLY GARCIA, Individually as Wrongful Death Beneficiary of A.J.G, *deceased minor*; RACHEL GARZA, Esq., as Representative of the Estate of A.J.G., *deceased minor*; MIGUEL CERRILLO, Individually and as Next Friend of M.I.C, *minor*; ABIGALE VELOZ, Individually and as Next Friend of M.I.C., *minor*; ANA RODRIGUEZ, Individually as Wrongful Death Beneficiary and as Representative of the Estate of M.Y.R., *deceased minor*; JERRY MATA, Individually as Wrongful Death Beneficiary of T.M.M., *deceased minor*; VERONICA MATA, Individually as Wrongful Death Beneficiary and as Representative of the Estate of T.M.M., *deceased minor*; JESSIE RODRIGUEZ, Individually as Wrongful Death Beneficiary of A.G.R., *deceased minor*; DEANNA GORNTO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of M.G.M. *deceased minor*; MARIA MAGDALENE GARCIA, Individually as Wrongful Death Beneficiary and as Representative of the Estate of N.A.B., *deceased minor*; JUAN JULIAN BRAVO, Individually as Wrongful Death Beneficiary of N.A.B., *deceased minor*; VERONICA LUEVANOS, Individually as Wrongful Death Beneficiary and as Representative of the Estate of J.N.S., *deceased minor*; JACOB SILGUERO, Individually as Wrongful Death Beneficiary of J.N.S., *deceased minor*; APRIL ELROD, Individually as Wrongful Death Beneficiary of and as Representative of the

Case No. 2:24-cv-00045-AM

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

(1)  42 U.S.C. § 1983 – 14th Amendment

(2)  42 U.S.C. § 1983 – 14th Amendment

(3)  42 U.S.C. § 1983 – 4th Amendment

(4)  42 U.S.C. § 1983 – Policy and Practice

(5)  42 U.S.C. § 1983 – Policy and Practice

(6)  Products Liability – Failure to Warn

(7)  Products Liability – Manufacturing Defect

(8)  Damages

(9)  Punitive/Exemplary Damages

1

Estate of M.L.E., *deceased minor*; KIMBERLY RUBIO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of A.A.R., *deceased minor*; FELIX RUBIO, Individually as Wrongful Death Beneficiary of A.A.R., *deceased minor*; JOSE LUEVANOS, Individually as Wrongful Death Beneficiary and as Representative of the Estate of J.C.L., *deceased minor*; CHRISTINA LUEVANOS, Individually as Wrongful Death Beneficiary of J.C.L., *deceased minor*; JENNIFER LUGO, Individually as Wrongful Death Beneficiary and as Representative of the Estate of E.A.G., *deceased minor*; STEVEN GARCIA, Individually as Wrongful Death Beneficiary of E.A.G., *deceased minor*; ALYSSA RODRIGUEZ, Individually as Wrongful Death Beneficiary for J.M.F., *deceased minor*; EVADULIA ORTA, Individually as Wrongful Death Beneficiary and as Representative of the Estate of R.F.T., *deceased minor*; MANDY MARIE RENFRO, Individually as Wrongful Death Beneficiary of U.S.G., *deceased minor;* DAVID BALMER, Esq., as Representative of the Estate of U.S.G., *deceased minor*; ELI TORRES, Individually as Wrongful Death Beneficiary of E.T., *deceased minor*; JOSE MARTINEZ, Individually and as Next Friend of A.J.M., *minor*; KASSANDRA CHAVEZ, Individually and as Next Friend of A.J.M., *minor*; VINCENT SALAZAR, III, Individually as Wrongful Death Beneficiary and as Representative of the Estate of L.M.S., *deceased minor;* MELINDA ALEJANDRO, Individually as Wrongful Death Beneficiary of L.M.S., *deceased minor*,

     *Plaintiffs,*

v.

2

**JUAN MALDONADO, an individual; CRIMSON ELIZONDO, an individual; RICHARD BOGDANSKI, an individual; LUKE WILLIAMS, an individual; CHRISTOPHER KINDELL, an individual; JOEL BETANCOURT, an individual; VICTOR ESCALON, an individual; TEXAS DEPARTMENT OF PUBLIC SAFETY DOES 1 through 84; MANDY GUTIERREZ, an individual; UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; PEDRO "PETE" ARREDONDO, an individual; ADRIAN GONZALES, an individual; JESUS "JJ" SUAREZ, an individual; SCHNEIDER ELECTRIC USA, INC.; and MOTOROLA SOLUTIONS, INC.,**

      ***Defendants.***

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................8

II.   JURISDICTION AND VENUE ...................................................................13

III.  THE PARTIES..............................................................................................14
      A.   PLAINTIFFS ......................................................................................14
      B.   DEFENDANTS ..................................................................................19
           i.    Texas Department of Public Safety Defendants ......................19
           ii.   Uvalde Consolidated Independent School District Defendants...............23
           iii.  Motorola Solutions, Inc.  .......................................................25

IV.   ALLEGATIONS APPLICABLE TO ALL COUNTS  ..................................25
      A.   THE RISE OF SCHOOL SHOOTINGS IN AMERICA AND THE
           VULNERABILITY OF OUR SCHOOLS...........................................25
      B.   STATE-MANDATED LOCKDOWN PROTOCOLS DIRECT
           STUDENTS AND TEACHERS TO STAY STILL AND SILENT UNTIL
           LAW ENFORCEMENT OFFICERS RELEASE THEM ....................28
      C.   IN AN ACTIVE SHOOTER INCIDENT, LAW ENFORCEMENT
           OFFICERS MUST IMMEDIATELY ISOLATE AND NEUTRALIZE
           THE SHOOTER ..................................................................................30
      D.   LAW ENFORCEMENT OFFICERS WHO CONFINE AN ACTIVE
           SHOOTER WITH LOCKED DOWN CHILDREN AND TEACHERS
           CREATE A DEATH TRAP .................................................................33
      E.   ROBB ELEMENTARY SCHOOL.......................................................35
      F.   GOING TO SCHOOL ON THE MORNING OF TUESDAY, MAY 24,
           2022.....................................................................................................35
      G.   THE ACTIVE SHOOTER APPROACHES ROBB ELEMENTARY
           SCHOOL .............................................................................................40
      H.   THE ACTIVE SHOOTER ENTERS ROBB ELEMENTARY SCHOOL
           WEST BUILDING ..............................................................................43
      I.   DEFENDANT OFFICERS FROM THE TXDPS ARRIVE ON SCENE
           WITHIN TWO MINUTES OF THE SHOOTER ENTERING THE
           SCHOOL, WHILE THE SHOOTER IS SHOOTING INSIDE
           CLASSROOMS 111 AND 112 .............................................................45
      J.   DEFENDANT UCISD-PD OFFICERS RETREAT, TRAPPING
           STUDENTS AND TEACHERS WITH THE ACTVE SHOOTER,
           WHILE DEFENDANT TXDPS OFFICERS HESITATE  ..................47
      K.   THE UVALDE COUNTY DISTRICT ATTORNEY'S OFFICE ALERTS
           DEFENDANT TXDPS RANGER KINDELL ABOUT THE ACTIVE
           SHOOTING .........................................................................................50
      L.   OFFICERS, INCLUDING DEFENDANTS, KNEW THERE WERE
           STUDENTS AND TEACHERS IN CLASSROOMS 111 AND 112 AND
           THEY KEPT THOSE STUDENTS AND TEACHERS TRAPPED WITH
           THE SHOOTER ..................................................................................52

M.    OFFICERS, INCLUDING DEFENDANTS, STOP PARENTS FROM RESCUING THE CHILDREN TRAPPED INSIDE CLASSROOMS 111 AND 112 .......................................................................................................................54

N.    OFFICERS SAVED THEMSELVES, NOT CHILDREN, FROM THE SHOOTER'S LETHAL BATTLE RIFLE.............................................................55

O.    OFFICERS, INCLUDING DEFENDANTS, ARE INDIFFERENT TO THE FACT THAT A TEACHER IS DYING INSIDE CLASSROOM 112......................................................................................................................57

P.    PLAINTIFF M.I.C. CALLS 911 FROM INSIDE CLASSROOM 112 AND OFFICERS ARE INDIFFERENT TO HER CRY FOR HELP .................59

Q.    OFFICERS' DECISION TO CONTAIN THE SHOOTER WITH HIS VICTIMS CAUSED CHILDREN TO SUFFER AND DIE ...............................63

R.    PLAINTIFFS HAVE RECEIVED LITTLE TRANSPARENCY AND NO ACCOUNTABILITY .............................................................................................66

V.    FIRST CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTEENTH AMENDMENT, SUBSTANTIVE DUE PROCESS CLAUSE/SPECIAL RELATIONSHIP).................69

VI.    SECOND CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER) ...............................................................................................................73

VII.    THIRD CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AMENDMENT, UNLAWFUL SEIZURE) ...............................................................................................74

VIII.    FOURTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANTS ARREDONDO AND SUAREZ IN THEIR OFFICIAL CAPACITIES AND UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO ENSURE COMPLIANCE WITH UNIVERSALLY ACCEPTED STANDARDS) .................................................74

IX.    FIFTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANTS ARREDONDO AND SUAREZ IN THEIR OFFICIAL CAPACITIES AND UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO ENSURE COMPLIANCE WITH UNIVERSALLY ACCEPTED STANDARDS) .....................76

X.    SIXTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – FAILURE TO WARN ....................76

XI.    SEVENTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA
       SOLUTIONS, INC., PRODUCTS LIABILITY – MANUFACTURING DEFECT.......78

XII.   DAMAGES.......................................................................................................................79
       A.    SURVIVAL DAMAGES OF DECEASED CHILDREN ...................................79
       B.    WRONGFUL DEATH BENEFICIARY DAMAGES OF SURVIVING
             PARENTS..........................................................................................................80
       C.    PERSONAL INJURY DAMAGES ARISING OUT OF THE INJURIES
             TO M.I.C. AND A.J.M. ...................................................................................82

XIII.  PUNITIVE AND EXEMPLARY DAMAGES ...............................................................83

XIV.   DEMAND FOR A JURY TRIAL ..................................................................................83

XV.    RELIEF SOUGHT............................................................................................................83

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs **JAVIER CAZARES**, Individually as Wrongful Death Beneficiary of **J.J.C.**, *deceased minor*; **SANTA GLORIA CAZARES**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of J.J.C.**, *deceased minor*; **KIMBERLY GARCIA**, Individually as Wrongful Death Beneficiary of **A.J.G.**, *deceased minor*; **RACHEL GARZA**, Esq., as Representative of the **Estate of A.J.G.**, *deceased minor*; **MIGUEL CERRILLO**, Individually and as Next Friend of **M.I.C.**, *minor*; **ABIGALE VELOZ**, Individually and as Next Friend of **M.I.C.**, *minor*;  **ANA RODRIGUEZ**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of M.Y.R.**, *deceased minor*; **JERRY MATA**, Individually as Wrongful Death Beneficiary of **T.M.M.**, *deceased minor*; **VERONICA MATA**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of T.M.M.**, *deceased minor*; **JESSIE RODRIGUEZ**, Individually as Wrongful Death Beneficiary of **A.G.R.**, *deceased minor*; **DEANNA GORNTO**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of M.G.M.**, *deceased minor*; **MARIA MAGDALENE GARCIA**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of N.A.B.**, *deceased minor*; **JUAN JULIAN BRAVO**, Individually as Wrongful Death Beneficiary of **N.A.B.**, *deceased minor*; **VERONICA LUEVANOS**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of J.N.S.**, *deceased minor*; **JACOB SILGUER**O, Individually as Wrongful Death Beneficiary of **J.N.S.**, *deceased minor*; **APRIL ELROD**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of M.L.E.**, *deceased minor*; **KIMBERLY RUBIO**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of A.A.R.**, *deceased minor*; **FELIX RUBIO**, Individually as Wrongful Death Beneficiary of **A.A.R.**, *deceased minor*; **JOSE LUEVANOS**, Individually as Wrongful Death Beneficiary and

7

as Representative of the **Estate of J.C.L.**, *deceased minor*; **CHRISTINA LUEVANOS**, Individually as Wrongful Death Beneficiary of **J.C.L.**, *deceased minor*; **JENNIFER LUGO**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of E.A.G.**, *deceased minor*; **STEVEN GARCIA**, Individually as Wrongful Death Beneficiary of **E.A.G.**, *deceased minor*; **ALYSSA RODRIGUEZ**, Individually as Wrongful Death Beneficiary of **J.M.F.**, *deceased minor*; **EVADULIA ORTA**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of R.F.T.**, *deceased minor*; **MANDY MARIE RENFRO**, Individually as Wrongful Death Beneficiary of **U.S.G.**, *deceased minor*; **DAVID BALMER**, Esq., as Representative of the **Estate of U.S.G.**, *deceased minor*; **ELI TORRES**, Individually as Wrongful Death Beneficiary of **E.T.**, *deceased minor*; **JOSE MARTINEZ**, Individually and as Next Friend of **A.J.M.**, *minor*; **KASSANDRA CHAVEZ**, Individually and as Next Friend of **A.J.M.**, *minor*; **VINCENT SALAZAR, III**, Individually as Wrongful Death Beneficiary and as Representative of the **Estate of L.M.S.**, *deceased minor;* **MELINDA ALEJANDRO**, Individually as Wrongful Death Beneficiary of **L.M.S.**, *deceased minor*, state the following claims for relief against the Defendants.

## I.    INTRODUCTION

1.      This case arises from the single greatest failure of law enforcement to confront an active shooter in American history.

2.      Most Texas elementary school classrooms have the same poster by the door that was in Robb Elementary School's Classroom 111: "LOCKDOWN! LOCKS, LIGHTS, OUT OF SIGHT."

3.      Because Texas public schools do not have the funds necessary to harden entry points and have a security officer on campus full-time, Texas schools rely on the supposed

protection of the lockdown drill when an active shooter attacks a school. Texas is not alone in this. States all across America mandate lockdown drills in preparation for an active shooter incident on campus.

4.      The truth is that against a shooter with an AR-15, a lockdown is barely any protection at all. Relying on silence and stillness, children in lockdown play a deadly round of hide-and-seek with a killer, ticking off the seconds until law enforcement comes. They know that if the game goes on too long, they will die. They are silent and still in the innocent faith that while they are hiding, law enforcement officers are racing to save them. They trust that those officers will stop at nothing to neutralize the shooter before he finds them.

5.      Children, parents, and teachers must have that faith for our schools to function. Without it, why would we trust our children to a school's care, in these terrible days of shooting after shooting?

6.      At Robb Elementary School on May 24, 2022, law enforcement officers destroyed that faith because of an AR-15.

7.      The Texas Department of Public Safety ("TXDPS") and Uvalde Consolidated Independent School District ("UCISD") promulgate policies and procedures that require all law enforcement personnel, including each of the Defendant officers, to follow specific active shooter protocols that include immediately neutralizing the threat. The 376 officers who arrived at Robb Elementary on May 24, 2022, abandoned that training. In doing so, they turned the ongoing lockdown into a death trap.

8.      For one hour, fourteen minutes, and eight seconds, the Defendant officers shielded themselves instead of the students and teachers whose lives depended on them. The Defendant officers, in direct contravention of TXDPS and UCISD policy, did not even attempt to neutralize

9

the shooter ("the Shooter"), who was armed with an AR-15 semi-automatic rifle. Instead, the Defendant officers affirmatively chose to "contain" the Shooter in the same barricaded classrooms as defenseless children and their teachers.   Effectively, the Defendants trapped children and teachers with the Shooter. The Defendants then affirmatively acted to prevent rescue efforts by parents and members of the community, to the point of pointing guns, using a Taser, and physically restraining parents seeking to approach the school.   In short, the officers' affirmative acts consigned twenty-nine children and three teachers to terror and nearly certain death.

9.     The Defendant officers' actions violated their clearly established duties under TXDPS and UCISD policies and procedures and caused immeasurable suffering. They made hide-and-seek easy for the Shooter. They enabled the Shooter to torture and terrify wounded and dying children and to find and kill children who were trying to hide. They deprived wounded children and teachers of the chance to survive.

10.     The Defendant officers' betrayal of their duties was absolute. "The officers have weapons, the children had none. The officers had body armor, the children had none. The officers had training, the subject had none," TXDPS Director McCraw testified before the Texas Senate Special Committee to Protect all Texans.

11.     "The law enforcement response to the attack at Robb Elementary was an abject failure and antithetical to everything we've learned over the last two decades since the Columbine massacre," Director McCraw continued.

12.     Law enforcement officers' actions were "indefensible," and "utterly unacceptable," in the words of Senator Ted Cruz.

13.     "What happened in Uvalde is not acceptable behavior in the eyes of the law enforcement community of the state of Texas," North Richland Hills Police Chief and Texas Police

Chiefs Association President Jimmy Perdue told the Texas Senate. San Marcos Police Chief Stan Standridge confirmed: "Our profession failed [on that] date."

14.     U.S. Attorney General Merrick Garland stated, "Had law enforcement agencies followed generally accepted practices in an active shooter situation and gone right after the shooter to stop him, lives would have been saved and people would have survived."

15.     This lawsuit seeks to hold Defendants accountable for their actions on May 24, 2022, and the suffering and death that resulted directly therefrom.

16.     Plaintiffs are the families of seventeen children who died on May 24, 2022, and two children who survived the shooting by hiding beside their dead classmates' bodies.

17.     Defendants include **UCISD-PD Chief Pedro Arredondo** and **Officer Adrian Gonzales.**

18.     Defendants also include **Defendants Texas Ranger Christopher Kindell, TXDPS Sergeant Juan Maldonado, TXDPS Trooper Crimson Elizondo, TXDPS Trooper Richard Bogdanski, TXDPS Special Agent Luke Williams, TXDPS Captain Joel Betancourt, TXDPS Regional Director Victor Escalon,** as well as newly added **Defendants Texas Ranger Division Lieutenant Randy Garcia, Texas Ranger Division Major Robert Smith, Texas Highway Patrol Captain Jerry Simpson,** and **TXDPS Lieutenant Noe Fernandez.**

19.     Ninety-one TXDPS officers responded to Robb Elementary School on May 24, 2022, while the UCISD-PD had five on scene. The TXDPS 2022 budget was $1.6 billion; the UCISD's budget was three-tenths of one percent (0.3%) of that amount. The leadership, training, and experience of **Defendant TXDPS** officers far outstripped the experience and abilities of a local school district police chief, and everyone on scene knew it.

11

20.     Yet the ninety-one TXDPS officers have significantly avoided public scrutiny. The release of UCISD and Uvalde Police Department body camera footage documenting **Chief Arredondo**'s cowardice have distracted attention from the equally grave misconduct of TXDPS officers. At the same time, the TXDPS has successfully resisted the public disclosure of most of its own officers' body camera footage, radio channel recordings, dispatch logs, and officer interviews and investigations. As a result, the names of the highly-resourced, highly-trained TXDPS commanders involved in the response are only now coming to light.

21.     On June 26, 2024, after Plaintiffs filed this suit, the Uvalde County District Attorney finally initiated criminal proceedings against **Chief Arredondo** and **Officer Gonzales**. The indictments confirm what Plaintiffs said years ago: responding officers criminally endangered the children they were sworn to protect. The indictments charge **Chief Arredondo** and **Officer Gonzales** with multiple felony counts of abandoning and endangering children, in violation of Article 22.041(c) of the Texas Penal Code. They allege that **Chief Arredondo** and **Officer Gonzales** "intentionally, knowingly, recklessly, and with criminal negligence" put the Shooter's victims in "imminent danger of death, bodily injury, and physical or mental impairment."

22.     The District Attorney charges that **Chief Arredondo** "failed to respond as trained to an active shooter incident" and "delay[ed] the response by law enforcement officer to an active shooter who was hunting and shooting a child or children in Room 112 at Robb Elementary School."

23.     The District Attorney charges that "[a]fter hearing gun shots and after being advised of the general location of the shooter and having time to respond to the shooter" **Officer Gonzales** "failed to engage, distract or delay the shooter and failed to attempt to engage, distract or delay the shooter until after the shooter entered rooms 111 and 112 of Robb Elementary School and shot

at a child or children in Rooms 111 and 112" and also "failed to follow and attempt to follow his active shooter training to respond to gun fire by advancing toward the gun fire until after the active shooter shot at one and more than one child or children in rooms 111 and 112 of Robb Elementary School."

24.     These criminal charges – and many more – are warranted. The culpability of the UCISD officers is the tip of the iceberg. The **TXDPS Defendants** are equally or more culpable of endangering and abandoning children who were being hunted by an active shooter.

25.     The **UCISD-PD Defendants** and the **TXDPS Defendants** violated clearly established constitutional rights. They confined students and teachers, including Plaintiffs' decedent children and the two living Plaintiff children, in Classrooms 111 and 112 at Robb Elementary School with the active shooter wielding an AR-15. They prevented the Plaintiff families from rescuing their children. And they prevented life-saving medical aid from reaching the wounded, including Plaintiffs' decedent children. Defendants betrayed these children to injury and death and destroyed their families' peace of mind forever.

## II.     JURISDICTION AND VENUE

26.     This case is brought pursuant to 42 U.S.C. § 1983 and under state law.

27.     Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 (federal question) and 1343 (federal civil rights). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367, because the state law claims are intertwined with the federal claims.

28.     Venue is proper in the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district. Defendants regularly conduct business in this district, and the wrongdoing giving rise to Plaintiffs' claims

occurred in Uvalde County, Texas, which is within this district and division. *See* 28 U.S.C. §
124(d)(5).

### III.   THE PARTIES

#### A.   PLAINTIFFS

29.   **Plaintiff Javier Cazares** brings claims Individually, as Wrongful Death
Beneficiary of **J.J.C.,** his daughter, a deceased minor who was nine years old and in the fourth
grade at Robb Elementary School on May 24, 2022**. Javier Cazares** is, and **J.J.C.** was, a resident
of Texas.

30.   **Plaintiff Santa Gloria Cazares** brings claims Individually, as Wrongful Death
Beneficiary and as Representative of the **Estate of J.J.C.,** her daughter, a deceased minor who
was nine years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Santa
Gloria Cazares** is, and **J.J.C.** was, a resident of Texas.

31.   **Plaintiff Kimberly Garcia** brings claims Individually, as Wrongful Death
Beneficiary of **A.J.G.,** her daughter, a deceased minor who was ten years old and in the fourth
grade at Robb Elementary School on May 24, 2022. **Kimberly Garcia** is, and **A.J.G.** was, a
resident of Texas.

32.   **Plaintiff Rachel Garza**, Esq., brings claims as Representative of the **Estate of
A.J.G.,** a deceased minor who was ten years old and in the fourth grade at Robb Elementary School
on May 24, 2022. **Rachel Garza** is, and **A.J.G.** was, a resident of Texas.

33.   **Plaintiff Miguel Cerrillo** brings claims Individually, and as Next Friend of minor,
**M.I.C.,** his eleven-year-old daughter, who was in the fourth grade at Robb Elementary School on
May 24, 2022. **Miguel Cerrillo** and **M.I.C.** are both residents of Texas.

34.     **Plaintiff Abigale Veloz** brings claims Individually, and as Next Friend of minor child, **M.I.C.**, her eleven-year-old daughter, who was in the fourth grade at Robb Elementary School on May 24, 2022. **Abigale Veloz** and **M.I.C.** are both residents of Texas.

35.     **Plaintiff Ana Rodriguez** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of M.Y.R.**, her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Ana Rodriguez** is, and **M.Y.R.** was, a resident of Texas.

36.     **Plaintiff Jerry Mata** brings claims Individually, as Wrongful Death Beneficiary of **T.M.M.**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jerry Mata** is, and **T.M.M.** was, a resident of Texas.

37.     **Plaintiff Veronica Mata** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of T.M.M.**, her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Veronica Mata** is, and **T.M.M.** was, a resident of Texas.

38.     **Plaintiff Jessie Rodriguez** brings claims Individually, as Wrongful Death Beneficiary of **A.G.R.**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jessie Rodriguez** is a citizen of Texas, and **A.G.R.** was a resident of Texas.

39.     **Plaintiff Deanna Gornto** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of M.G.M.**, her daughter, a deceased minor who was eleven years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Deanna Gornto** is, and **M.G.M.** was, a resident of Texas.

40. **Plaintiff Maria Magdalene Garcia** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of N.A.B.**, her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Maria Magdalene Garcia** is, and **N.A.B.** was, a resident of Texas.

41. **Plaintiff Juan Julian Bravo** brings claims Individually, as Wrongful Death Beneficiary of **N.A.B.**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Juan Julian Bravo** is, and **N.A.B.** was, a resident of Texas.

42. **Plaintiff Veronica Luevanos** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of J.N.S.**, her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Veronica Luevanos** is, and **J.N.S.** was, a resident of Texas.

43. **Plaintiff Jacob Silguero** brings claims Individually, as Wrongful Death Beneficiary of **J.N.S.**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jacob Silguero** is, and **J.N.S.** was, a resident of Texas.

44. **Plaintiff April Elrod** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of M.L.E.**, her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **April Elrod** is, and **M.L.E.** was, a resident of Texas.

45. **Plaintiff Kimberly Rubio** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of A.A.R.**, her daughter, a deceased minor who

was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Kimberly Rubio** is, and **A.A.R.** was, a resident of Texas.

46.     **Plaintiff Felix Rubio** brings claims Individually, as Wrongful Death Beneficiary of **A.A.R**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Felix Rubio** is, and **A.A.R.** was, a resident of Texas.

47.     **Plaintiff Jose Luevanos** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of J.C.L.**, his son, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jose Luevanos** is, and **J.C.L.** was, a resident of Texas.

48.     **Plaintiff Christina Luevanos** brings claims Individually, as Wrongful Death Beneficiary of **J.C.L.**, her son, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Christina Luevanos** is, and **J.C.L.** was, a resident of Texas.

49.     **Plaintiff Jennifer Lugo** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of E.A.G.**, her daughter, a deceased minor who was nine years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jennifer Lugo** is, and **E.A.G.** was, a resident of Texas.

50.     **Plaintiff Steven Garcia** brings claims Individually, as Wrongful Death Beneficiary of **E.A.G.**, his daughter, a deceased minor who was nine years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Steven Garcia** is, and **E.A.G.** was, a resident of Texas.

51.     **Plaintiff Alyssa Rodriguez** brings claims Individually, as Wrongful Death Beneficiary of **J.M.F.,** her son, a deceased minor who was ten years old and in the fourth grade at

Robb Elementary School on May 24, 2022. **Alyssa Rodriguez** is a citizen of Texas, and **J.M.F.** was, a resident of Texas.

52.      **Plaintiff Evadulia Orta** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of R.F.T.**, her son, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Evadulia Orta** is, and **R.F.T.** was, a resident of Texas.

53.      **Plaintiff Mandy Marie Renfro** brings claims Individually, as Wrongful Death Beneficiary of **U.S.G.**, her son, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Mandy Marie Renfro** is a citizen of Texas, and **U.S.G.** was a resident of Texas.

54.      **Plaintiff David Balmer**, Esq., brings claims as Representative of the **Estate of U.S.G.**, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **David Balmer** is, and **U.S.G.** was, a resident of Texas.

55.      **Plaintiff Eli Torres** brings claims Individually, as Wrongful Death Beneficiary of **E.T.**, his daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Eli Torres** resides in Kentucky, and is a citizen of Texas, and **E.T.** was a resident of Texas.

56.      **Plaintiff Jose Martinez** brings claims Individually, and as Next Friend of **A.J.M.**, his son, a minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Jose** and **A.J.M.** are residents of Texas.

57.      **Plaintiff Kassandra Chavez** brings claims Individually, and as Next Friend of **A.J. M.**, her son, a minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Kassandra Chavez** and **A.J.M.** are residents of Texas.

58.     **Plaintiff Vincent Salazar III** brings claims Individually, as Wrongful Death Beneficiary and as Representative of the **Estate of L.M.S.,** his daughter, a deceased minor who was eleven years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Vincent Salazar III** is, and **L.M.S.** was, a resident of Texas.

59.     **Plaintiff Melinda Alejandro** brings claims Individually, as Wrongful Death Beneficiary of **L.M.S.,** her daughter, a deceased minor who was eleven years old and in the fourth grade at Robb Elementary School on May 24, 2022. **Melinda Alejandro** is, and **L.M.S.** was, a resident of Texas.

60.     The deceased children and **Plaintiffs M.I.C.** and **A.J.M.** are collectively referred to herein as the **Child Plaintiffs**.

61.     The parents suing in their individual capacities are referred to as the **Parent Plaintiffs**.

**B.      DEFENDANTS**

**i.      Texas Department of Public Safety Defendants**

62.     At all times relevant to this suit, **Defendant Juan Maldonado** was a TXDPS Sergeant and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Juan Maldonado** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Juan Maldonado** may be served at 121 W Mill St, Uvalde, TX 78801-5931, or wherever he may be found. **Defendant Juan Maldonado** arrived on scene at approximately 11:34 a.m.

63.     At all times relevant to this suit, **Defendant Crimson Elizondo** was a TXDPS Trooper and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Crimson Elizondo** is an individual residing in the state of Texas. She is being sued in her individual capacity. **Crimson Elizondo** may be served at 216 Minter St, Uvalde, TX 78801-4215, or

19

wherever she may be found. **Defendant Crimson Elizondo** arrived on scene at approximately 11:35 a.m.

64.     At all times relevant to this suit, **Defendant Richard Bogdanski** was a TXDPS Trooper and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Richard Bogdanski** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Richard Bogdanski** may be served at 129 Shady Terrace Ln, Rockport, TX 78382-7977, or wherever he may be found. **Defendant Richard Bogdanski** arrived on scene at 11:49 a.m. or earlier.

65.     At all times relevant to this suit, **Defendant Luke Williams** was a TXDPS Special Agent and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Luke Williams** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Luke Williams** may be served wherever he may be found. **Defendant Luke Williams** arrived on scene at approximately 11:53 a.m.

66.     At all times relevant to this suit, **Defendant Christopher Kindell** was a Texas Ranger with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Christopher Kindell** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Christopher Kindell** may be served at 1 El Norte Cir, Uvalde, TX 78801-4020, or wherever he may be found. **Defendant Christopher Kindell** arrived on scene at approximately 11:55 a.m.

67.     At all times relevant to this suit, **Defendant Joel Betancourt** was a TXDPS Captain and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Joel Betancourt** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Joel**

**Betancourt** may be served at 3143 Homer Dr, Laredo, TX 78041-1936, or wherever he may be found. **Defendant Joel Betancourt** arrived on scene at approximately 12:30 p.m.

68.    At all times relevant to this suit, **Defendant Victor Escalon** was the Regional Director of the South Texas Region of the Texas Department of Public Safety and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Victor Escalon** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Victor Escalon** may be served at 216 Ben Hogan Ave, McAllen, TX 78503-3113, or wherever he may be found. **Defendant Victor Escalon** arrived on scene prior to 12:50 p.m.

69.    At all times relevant to this suit, **Defendant Randy Garcia** was a Texas Ranger Division ("TRD") Lieutenant with the TXDPS and was acting as such on May 24, 2022. **Defendant Randy Garcia** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Randy Garcia** may be served at 7047 Hallie Spirit, San Antonio, TX 78227-4866, or wherever he may be found. **Defendant Randy Garcia** arrived on scene at approximately 12:35 p.m., and was repeatedly updated on the situation at Robb Elementary School from 11:38 a.m. onward. **Defendant Randy Garcia's** name was concealed from the Plaintiffs until after May 24, 2024 and thus he was identified in the Plaintiffs' Original Complaint as a **John Doe Defendant**.

70.    At all times relevant to this suit, **Defendant Robert Smith** was a TRD Major with the TXDPS and was acting as such on May 24, 2022. **Defendant Robert Smith** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Robert Smith** may be served at 865 Lietrum St, Vidor, TX 77662-2958, or wherever he may be found. **Defendant Robert Smith** was notified of the reported active shooting at approximately 11:40 a.m. and he was repeatedly updated on the situation at Robb Elementary School from that time onward. **Defendant Robert Smith** arrived on scene after the Shooter was neutralized. **Defendant Robert Smith's**

21

name was concealed from the Plaintiffs until after May 24, 2024 and thus he was identified in the Plaintiffs' Original Complaint as a **John Doe Defendant**.

71.     At all times relevant to this suit, **Defendant Jerry Simpson** was a Texas Highway Patrol ("THP") Captain with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Jerry Simpson** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Jerry Simpson** may be served at 1012 Aledo Ridge Ct, Fort Worth, TX 76108, or wherever he may be found. **Defendant Jerry Simpson** acted in a supervisory capacity and on information and belief, was on scene well before the Shooter was neutralized. **Defendant Jerry Simpson's** name was concealed from the Plaintiffs until after May 24, 2024 and thus he was identified in the Plaintiffs' Original Complaint as a **John Doe Defendant**.

72.     At all times relevant to this suit, **Defendant Noe Fernandez** was a Lieutenant with the TXDPS and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Noe Fernandez** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Noe Fernandez** may be served at 213 Gabriellas Way, Del Rio, TX 78840, or wherever he may be found. **Defendant Noe Fernandez's** name was concealed from the Plaintiffs until after May 24, 2024 and thus he was identified in the Plaintiffs' Original Complaint as a **John Doe Defendant**. On information and belief, **Defendant Noe Fernandez** was on scene at 12:34 a.m. or before, and certainly by 12:47 p.m. On information and belief, prior to his arrival on scene, **Noe Fernandez** received multiple updates regarding what was happening on scene.

73.     **Defendants TXDPS Does 1 through 80** are officers of the Texas Department of Public Safety who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of the Plaintiffs and the rights of the Plaintiffs under state law and are liable to Plaintiffs. At all relevant times **Does 1 through 80** were

22

acting in the scope of their employment under color of state law, and in their individual capacities.
**Does 1 through 80** are sued in their individual capacities.

74.     **Defendants Juan Maldonado, Crimson Elizondo, Richard Bogdanski, Luke Williams, Christopher Kindell, Joel Betancourt, Victor Escalon, Randy Garcia, Robert Smith, Jerry Simpson, Noe Fernandez**, and **TXDPS Does 1 through 80** are hereafter referred to as the "**TXDPS Defendants**," all of whom were acting within the course and scope of their employment and under color of state law at all relevant times.

ii.     **Uvalde Consolidated Independent School District Defendants**

75.     **Defendant Uvalde Consolidated Independent School District ("UCISD")** is a public school district in Uvalde, Texas. Robb Elementary School is/was one of the schools within the **UCISD**. **UCISD** was at all relevant times responsible for the care, safety, management and security of Robb Elementary School students, teachers and campus. The Uvalde Consolidated Independent School District Police Department, ("UCISD-PD") is an agency of the **UCISD**. The **UCISD** is and was charged by law with the administration and operation of the UCISD-PD, including the training, policies and practices of the UCISD-PD, and is legally responsible for the acts and omissions of the UCISD-PD. Pursuant to Chapter 37 of the Texas Education Code, the **UCISD** board set forth a policy authorizing commissioned peace officers to enforce rules adopted by the board and focused on the protection of school district students, staff, buildings, and grounds. At all relevant times, the UCISD-PD was directed to enforce appropriate rules for the orderly conduct of the district in carrying out its purposes and objectives as a separate jurisdiction relating to the conduct of its students and personnel.  On May 24, 2022, the UCISD-PD employed five officers. **Defendant UCISD** may be served with process through UCISD Superintendent Ashley

Chohlis and/or through UCISD Board of Trustees President Calvin Lambert at 1000 North Getty Street, Uvalde, Texas 78801, or wherever they may be found.

76.     At all times relevant to this suit, **Defendant Pedro "Pete" Arredondo** was Chief of the UCISD-PD and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Pedro "Pete" Arredondo** is an individual residing in the state of Texas. He is being sued in his official and individual capacities. **Pedro "Pete" Arredondo** may be served at 101 Larkspur Dr, Uvalde, TX 78801-6303, or wherever he may be found. **Defendant Pedro "Pete" Arredondo** entered the West building at 11:35 a.m.

77.     At all times relevant to this suit, **Defendant Adrian Gonzales** was an Officer of the UCISD-PD and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Adrian Gonzales** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Adrian Gonzales** may be served at 474 Spinnaker Loop, Kyle, TX 78640-2594, or 317 Studer Cir, Uvalde, TX 78801-4041, or wherever he may be found. **Defendant Adrian Gonzales** was on scene at 11:31 a.m.

78.     **Defendants Pete Arredondo** and **Adrian Gonzales** are hereafter referred to as the "**UCISD-PD Defendants**," both of whom were acting within scope of employment and under color of state law at all relevant times on May 24, 2022.

79.     At all times relevant to this suit, **Defendant Jesus "JJ" Suarez** was a member of the **UCISD** School Board and was acting as such at Robb Elementary School on May 24, 2022. **Defendant Jesus "JJ" Suarez** is an individual residing in the state of Texas. He is being sued in his individual capacity. **Jesus "JJ" Suarez** may be served at 617 E Leona St, Uvalde, TX 78801-4410, or Southwest Texas Junior College, at 2401 Garner Field Road, Uvalde, Texas 78801, or

wherever he may be found. **Defendant Jesus "JJ" Suarez** entered the West building at approximately 11:41 a.m.

### iii. Motorola Solutions, Inc.

80.    At all relevant times to this suit, based on information and belief, **Defendant Motorola Solutions, Inc. ("Motorola")** designed and/or sold the radio communication devices used by some of the first responders while responding to the Robb Elementary School Shooting on May 24, 2022. **Motorola** is a Delaware corporation with its principal office in Chicago, Illinois. **Motorola** is a communications technology company that develops and implements mobile, radio, and wireless communication systems, command center software, and security systems for government and commercial customers worldwide. **Motorola** may be served with process by serving its registered agent, C T Corporation System, at 208 SO Lasalle Street, Suite 814, Chicago, Illinois 60604-1101.

## IV.    ALLEGATIONS APPLICABLE TO ALL COUNTS

81.    On May 24, 2022 at Robb Elementary School, 376 officers responded to the scene. Those officers' actions trapped children rather than releasing them. Officers increased the risk that children would be shot rather than protecting them. Officers who would not help trapped children stopped parents from reaching them. Officers blocked medics from reaching the wounded until it was too late. This complaint begins to unveil what happened that day.

## A.    THE RISE OF SCHOOL SHOOTINGS IN AMERICA AND THE VULNERABILITY OF OUR SCHOOLS

82.    On April 20, 1999, two high school seniors massacred twelve students and a teacher at Columbine High School in Littleton, Colorado. It was the worst school shooting America had ever seen.

83.     Since the Columbine shooting, the number of school-related gun incidents has increased, and school shootings have become increasingly fatal. More than 370,000 students have experienced gun violence at school since Columbine.

84.     In the five years immediately before the Robb Elementary School shooting, the incidence and fatality of school shootings rose even more exponentially.

85.     In the 2017-2018 school year, a student's chance of dying in a school shooting reached its highest level in at least 25 years.

86.     The 2021-2022 school year had the highest number of school shootings since record-keeping began in 2000.

87.     Also since Columbine, America has seen more and more attacks on schools where the attacker intends to carry out a mass killing.

88.     On April 16, 2007, a student at Virginia Tech University shot and killed 32 students and educators and wounded at least 17 more people.

89.     On December 14, 2012, a troubled young man used an AR-15-style rifle to murder 20 children and six educators at Sandy Hook Elementary School in Newtown, Connecticut.

90.     On February 14, 2018, a gunman opened fire on students, teachers, and staff at Marjory Stoneman Douglas High School in Parkland, Florida, killing 17 and injuring 17 more.

91.     In response to these and other shootings, a massive school security industry has developed, on which schools are spending $3 billion per year. Schools are implementing single-point-of-entry access; imposing visitor restrictions; installing automatically dead-bolting doors, bulletproof glass and panic buttons; and increasing the number and presence of security personnel.

92.     Texas had its own school shooting tragedy in May 2018. In what Governor Abbott called "one of the most heinous attacks that we've ever seen in the history of Texas schools," a

student at Santa Fe High School in Santa Fe, Texas shot and killed eight students and two teachers and wounded 13 others. The attack ended when school security officers and a state trooper confronted and exchanged fire with the shooter.

93.     Texas lawmakers' response to the Santa Fe shooting included legislation directing school districts to implement multi-hazard emergency operation plans, required additional training for school resource officers and school district employees, and created school threat assessment teams. As part of that response, Texas's Commissioner of Education promulgated rules requiring regular lockdown drills. Governor Abbott said the legislative package would do "more than Texas has ever done to make schools safer places for our students, for our educators, for our parents and families."

94.     But the massive investment it would take to actually harden Texas schools against an attacker with a battle rifle was not made. Texas's schools were not suddenly "safer places." This state's nearly 9,000 school campuses were almost all built before defense against a gunman with an AR-15 was a design necessity, and the legislature was not willing to appropriate the amount necessary to fund upgrades that could give students and teachers some protection from an active shooter.

95.     Uvalde Consolidated Independent School District, with its 4,116 students at eight school campuses, received $69,000 to harden its schools in the wake of the Santa Fe shooting. Part of this money went to build a five-foot perimeter fence around Robb Elementary School. On May 24, 2022, the Shooter easily jumped over that fence.

96.     In today's Texas, just like in the rest of America, the question is not if another mass shooting at a school will occur; the question is when.

97.     For Texas's schools, especially poorer schools like those in Uvalde County, it would be a matter of minutes at best, and seconds at worst, before an active shooter gained entry to the school. Students and teachers' survival would depend on the speed and effectiveness of the law enforcement response.

**B.     STATE-MANDATED LOCKDOWN PROTOCOLS DIRECT STUDENTS AND TEACHERS TO STAY STILL AND SILENT UNTIL LAW ENFORCEMENT OFFICERS RELEASE THEM**

98.     Texas Education Code § 37.114 provides that the Texas Commissioner of Education, in consultation with the Texas School Safety Center and the state fire marshal, must adopt rules for best practices for conducting emergency school drills and exercises, including definitions for relevant terms.

99.     As part of the effort to make Texas schools safer after the Santa Fe High School shooting, Commissioner of Education Mike Morath issued Texas Administrative Code Rule § 103.1209, "Mandatory School Drills."

100.    The Commissioner's new rule required school districts to conduct emergency safety drills. One of these was the lockdown drill.

101.    The rule defined a lockdown drill as "[a] response action schools take to secure interior portions of school buildings and grounds during incidents that pose an immediate threat of violence inside the school. The primary objective is to quickly ensure all school students, staff, and visitors are secured away from immediate danger." 19 Tex. Admin. Code § 103.1209(b)(3).

102.    The Texas School Safety Center ("TxSSC") is an official university-level research center at Texas State University in San Marcos, Texas, which provides K-12 schools in Texas with safety and security protocols and guidance, determining best practices for Texas schools.

103.    TxSSC promulgates a Standard Response Protocol for a lockdown ("the Texas Lockdown SRP").

104.    The Texas Lockdown SRP provides that "Lockdown is called when there is a threat or hazard **inside** the school building. From parental custody disputes to intruders to an active shooter, Lockdown uses classroom and school security actions to protect students and staff from threat."

105.    The Texas Lockdown SRP continues, "The Lockdown Protocol demands locking individual classroom doors, offices and other securable areas, moving room occupants out of line of sight of corridor windows and having room occupants maintain silence."

106.    Per the Texas Lockdown SRP, teachers and students must keep the classroom door closed until law enforcement officers open it: "Teacher, staff, and student training reinforces the practice of **not** opening the classroom door, once in Lockdown. Rather, no indication of occupancy should be revealed until first responders open the door." That is, teachers and their students are trained – by the state of Texas – to remain in their classrooms during lockdowns with the door closed until law enforcement officers authorize them to leave.

107.    TxSSC materials, including the "Training and Drills" section of the "A Parent's Guide to School Safety Toolkit" provide that parents should assure their children that the better they follow the lockdown drill instructions, the safer they will be in a real shooting.

108.    Per the TxSSC Parent's Guide, parents should teach their children to wait for law enforcement, even if it is a "a real active threat emergency, such as an active shooter."

109.    Also, per the TxSSC Parent's Guide, students are not to use their phones: "During the lockdown drill, which is the drill used when a threat is located inside the school building, the

29

skill of staying quiet is important to practice. During this drill, and in a real-life event, student and staff cellphones are to be silenced, and everyone is to stay quiet."

110.  19 Tex. Admin. Code § 103.1209 directs that schools conduct lockdown drills at least twice per year.

111.  As required by Texas law, Robb Elementary School, including the teachers and students in Classrooms 111 and 112, trained on the Texas Lockdown SRP.

112.  The teachers and students in Classrooms 111 and 112, and all of Robb Elementary School's faculty and students, were familiar with lockdowns. Because of the school's proximity to the border, teachers and students had experienced multiple lockdowns in addition to the two drills per year required by Texas law.

113.  Robb teachers and students relied on and followed the lockdown protocols prescribed by the state of Texas. The lockdown summary protocol was posted just inside classroom doors: "LOCKDOWN: LOCKS, LIGHTS, OUT OF SIGHT." The posting directed students to move out of sight, to maintain silence, and to not open the door. It instructed teachers to lock interior doors, turn out the lights, move away from sight, not open the door, maintain silence and take attendance. Once locked down, students at Robb Elementary School – just like students at any other Texas school – would wait for law enforcement officers to come.

## C.  IN AN ACTIVE SHOOTER INCIDENT, LAW ENFORCEMENT OFFICERS MUST IMMEDIATELY ISOLATE AND NEUTRALIZE THE SHOOTER

114.  The law enforcement community's agreed definition of active shooter is "an individual actively engaged in killing or attempting to kill people in a confined and populated area." (The White House, United States Department of Justice, Federal Bureau of Investigation, United States Department of Education, United States Department of Homeland Security and

Federal Emergency Management Agency use this definition, as do other law enforcement agencies and training providers across the country).

115.    The definition of an active shooter – "an individual actively engaged in killing or attempting to kill people in a confined and populated area" – dictates the law enforcement response. It is law enforcement's job to immediately isolate and neutralize someone who is actively engaged in killing or attempting to kill people in a confined and populated area. Clearly established active shooter protocols require law enforcement to immediately isolate and neutralize active shooters.

116.    Analysis of the failed law enforcement response to the 1999 Columbine school shooting led to a crystal-clear active shooter response doctrine.

117.    At Columbine, officers on the scene set up a perimeter and waited 47 minutes before entering the school. While they delayed, the two Columbine shooters casually killed and wounded students – and wounded students bled where they lay. Some died because of the law enforcement delay. Until Uvalde, Columbine was the model for what not to do.

118.    The lesson from Columbine was simple. Law enforcement delay in neutralizing an active shooter in a school would be measured in students' lives lost. A new active shooter doctrine was adopted by law enforcement agencies across the country. First responders must react immediately to confront the shooter to prevent further killing and to urgently render first aid to victims. In short, in an active shooter event, officers must confront the subject and stop his actions immediately. TXDPS Director McCraw acknowledged the standard: "the doctrine since [Columbine] has been that in an active shooter situation, it's to immediately locate the subject, isolate him and neutralize him." Director McCraw underlined that point, testifying that "[i]f you don't immediately confront an active shooter, lives are going to be lost."

31

119.     Advanced Law Enforcement Rapid Response Training (ALERRT) is nationally recognized as the preeminent active shooter/attack response training provider in the nation. ALERRT is based at Texas State University in San Marcos, Texas. More than 200,000 state, local, and tribal first responders (over 140,000 of them law enforcement) from all 50 states, the District of Columbia, and U.S. territories have received ALERRT training over the last 20 years.

120.     Each and every law enforcement department in the state of Texas, especially and including all departments present at Robb Elementary School on May 24, 2022, subscribed to, were trained on, and were bound to follow ALERRT protocols and training. TXDPS's training program includes a Reality Based Training Unit, which instructs the ALERRT Level 1 course to department members.

121.     ALERRT teaches that first responders' priorities in an active shooter incident are to first "Stop the Killing," then "Stop the Dying," and then "Evacuate the Injured."

122.     Officers responding to an active school shooting are to draw the shooter's attention away from potential victims, draw the shooter away from new or wounded victims, and take immediate action to neutralize the shooter, including use of necessary and deadly force.

123.     ALERRT doctrine requires law enforcement to act immediately. Waiting for equipment, more highly trained officers, and all other forms of delay are unacceptable.

124.     Even waiting for a four-or five-person team of first-on-site officers to gather is not acceptable. Recent tactical training emphasizes solo officer response when the situation demands. The doctrine provides that, "[i]n many cases that immediate response means a single (solo) officer response until such times as other forces can arrive. The best hope that innocent victims have is that officers immediately move into action to isolate, distract or neutralize the threat, even if that means one officer acting alone."

32

125.    ALERRT training teaches that any law enforcement officer can assume command, that somebody must assume command, and that waiting is not an option.

126.    From the moment a shot is fired at a school, it is an active shooter incident.

127.    At no point during a school shooting can law enforcement elect to treat a shooter as a "barricaded subject" and not an active shooter. As TXDPS Director McCraw testified, "When a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a 'barricaded subject.'"

128.    Director McCraw's statement is elementary: someone who fires a weapon at a school cannot be a barricaded subject. The International Association of Chiefs of Police defines a barricaded subject as "an individual who is the focus of a law enforcement intervention effort, who has taken a position in a physical location that does not allow immediate law enforcement access, and is refusing law enforcement orders to exit" and "who is not suspected of committing a crime."

129.    ALERRT doctrine addresses the fact that taking immediate action to isolate and neutralize an armed attacker may be very dangerous for law enforcement officers. The doctrine is not ambiguous. It determines priority of life. In an active shooter situation, the first priority is to preserve the lives of victims and potential victims. The safety of officers is of secondary priority. Under ALERRT protocols, officers must act immediately, regardless of the risk to themselves.

**D.    LAW ENFORCEMENT OFFICERS WHO CONFINE AN ACTIVE SHOOTER WITH LOCKED DOWN CHILDREN AND TEACHERS CREATE A DEATH TRAP**

130.    "If you don't immediately confront an active shooter, lives are going to be lost," TXDPS Director McCraw stated.

131.    Lockdown protocols work in tandem with – and rely on – ALERRT immediate response protocols. Teachers and students are trained and required to freeze, hide, and stop any

33

other efforts to protect themselves precisely *because* law enforcement officers will respond immediately to keep students safe and stop the threat. Teachers and students do this because they are following rules laid down by Texas's Commissioner of Education.

132.    Lockdown deprives teachers and students of assistance from anyone but law enforcement. Parents and family members cannot contact them, find them, or reach them. Emergency medical responders cannot get through the law enforcement perimeter to treat the wounded. Once law enforcement officers arrive and set up a perimeter, they have undertaken to be the lone vector of rescue for teachers and students.

133.    Responding law enforcement officers have the sole power to determine how long locked down students and teachers will be confined with the shooter.

134.    According to ALERRT doctrine, the time of confinement in lockdown with the active shooter should be as close to zero as possible, because the overwhelming priority is to "stop the killing and stop the dying."

135.    By prolonging a lockdown in an active shooter incident, law enforcement officers trap and confine students and teachers with the active shooter.

136.    By prolonging a lockdown in an active shooter incident, law enforcement officers require that trapped teachers and students remain in place, and thus increase the likelihood that a shooter will find and shoot a child or a teacher and that wounded victims will die.

137.    By prolonging a lockdown, law enforcement officers increase the terror and trauma students and teachers endure.

138.    Law enforcement officers know all of this. This is exactly why ALERRT training mandates an immediate neutralization of the shooter.

### E.    ROBB ELEMENTARY SCHOOL

139.    Uvalde is a close-knit community. About 25,000 people live in Uvalde County, including the roughly 15,000 who live in the City of Uvalde.

140.    The ties between Uvalde's law enforcement community and its schools were particularly close. Law enforcement officers' children attended Robb Elementary School, and their wives taught there.

141.    In the 2021-22 school year, UCISD had 4,102 students. Robb Elementary School held the classrooms of about 600 second, third and fourth grade students.

142.    Robb Elementary's West building was full of fourth grade classrooms.



*Diagram of Robb Elementary School West Building*

### F.    GOING TO SCHOOL ON THE MORNING OF TUESDAY, MAY 24, 2022

143.    May 24, 2022 was a Tuesday, and school started at 7:30 am.

144.    On the morning of May 24, 2022, nine-year-old **J.J.C.** had plans to help as many people as she possibly could in her life. She loved being with her friends. She did not want school to end for the year, because she wouldn't be able to see her friends every day. In the last few days, **J.J.C.** had had one-on-one talks with her mom about her future and growing up.

145.    **A.J.G.** was looking forward to a summer of swimming, playing outside, and spending time with her mom **Kimberly** and her little brother. **A.J.G.** was a friend and a protector by nature. She was creative, artistic, and loving. For Mother's Day – just sixteen days earlier – **A.J.G.** had surprised her mom with a poem called "Five Things I Love About My Mom." The poem was a work of art written on popsicle sticks, one line per stick.

146.    **M.I.C.**, a student in Classroom 112, loved school and being around people. She loved spending time with both of her parents, especially camping, going to the river, hiking, and being outside with her dad **Miguel**. **M.I.C.** wanted to be a doctor.

147.    **M.Y.R.** was curious, competitive, interested in learning (science in particular), and did not hesitate to figure things out on her own. Even though she loved to go on trips with her mom, **Ana**, **M.Y.R.'s** very favorite place to be was home with her mom. They laughed together, they talked about everything, and they supported each other. **M.Y.R.** was the youngest of three, following in the footsteps of two big brothers.

148.    **T.M.M.** was just starting to get into softball – following her big sister, Faith. Faith was in college, and they spoke on the phone almost every night. **T.M.M.** loved dancing, making videos with her best friends, and watching her mom **Veronica** cook. **T.M.M.** was honest and strong in her opinions, which she did not hesitate to share. That was one of her mom's favorite qualities about **T.M.M.. T.M.M.'s** dad **Jerry** loved her one-of-a-kind laugh.

149.   **A.G.R.** was a bright student who enjoyed school, music, and dancing. **A.G.R.** had a twin sister named A. and an older sister named A. Her cousin **J.J.C.** was in the same classroom.

150.   **M.G.M.** loved animals and playing outside, just like her mom **Deanna**. **M.G.M.** was shy until she got to know someone – then her silly side came out. **M.G.M.** had a little brother and together they liked to find treasures like feathers, rocks, and shells, to give to their mom.

151.   On the morning of May 24, 2022, **N.A.B.'s** mom **Maria** brought her to school, just like she did every day. **N.A.B.** came from a big family. She had two brothers, one sister, and her mom and her dad. Just a week before, **N.A.B.** had visited her grandpa in Mexico so that he could take her horseback riding. And the day before, her dad **Juan** had taken **N.A.B.** and all of her siblings on a long walk with their dog, Toby. **N.A.B.** was always with her family. On Friday nights, they would always go out to eat and then get ice cream afterwards.

152.   **J.N.S.'s** mom **Veronica** took her to school that Tuesday, like she did every day. They talked the whole way there, then **J.N.S.** hugged and kissed her mother goodbye for the last time. **J.N.S.** loved to spend time playing outside with her dad, **Jacob**. **J.N.S.** was the youngest of four. She had spent her last weekend at the river with her family. **J.N.S.** was best friends with **T.M.M.** and **M.Y.R.**

153.   On the morning of May 24, 2022, **M.L.E.** looked forward to school. It was a place of comfort and familiarity since her mom **April** was a teacher. **M.L.E.** loved cheerleading and gymnastics and looked forward to being a Uvalde High School cheerleader like her big sister. She loved to play outside with her two sisters and little brother, ride go carts, ride horses, and perform dance routines. **M.L.E.** loved her family hard, with lots of hugs and kisses.

154.   **A.A.R.** began the morning of May 24, 2022 at home with her mom, dad, three brothers and two sisters. She adored her teacher. She looked up to strong female leaders, sharing

that and an interest in politics with her mom. **A.A.R.** had spent time the last few days practicing softball with her dad and watching movies with her family.

155.    On the morning of May 24, 2022, **J.C.L.** walked to school with his dad **Jose**. **J.C.L.** was the youngest of four. He was bright – he spoke two languages. He loved to walk barefoot and preferred to be outside. His mom **Christina** had taken **J.C.L.** to play kickball with family and neighborhood friends just two days ago. Every day after school, **J.C.L.'s** dad met him at school, and they walked home together. **J.C.L.** was **J.N.S.'s** cousin.

156.    **E.A.G.** loved to go to the radio station with her dad **Steven**, where he worked as a DJ. They shared a passion for music. Her dad would play music, and they would dance and sing into the microphone together. **E.A.G.** liked to make slime with her big sister and hide it around the house for her mom **Jennifer** to find. In the last few days, **E.A.G.** had spent time with her parents, siblings, and grandparents laughing, playing, and riding the lawnmower down the street together.

157.    **J.M.F.** was an honor roll student who helped his dad with his work around the ranch. **J.M.F.** loved baseball. He had a big family: his mom **Alyssa**, dad Jose Sr., three brothers, and two sisters. He loved his family and was a particularly protective brother. **J.M.F.** had a giggly laugh and sweet smile that his mother loved.

158.    On the morning of May 24, 2022, **R.F.T.'s** mom **Evadulia** watched him get on the bus with his big brother and little sister and head off to school. **R.F.T.** loved to play games and spend time at the park with his mom. He enjoyed school – particularly math. **R.F.T.** was very close to his teacher, Mr. Reyes.

159.    **U.S.G.** had only recently joined the community. This was his first year in school in Uvalde. One of his very best friends was **J.C.L.**. **U.S.G.** was thriving in Mr. Reyes's class. He was known as a jokester who made people laugh.

160.    **E.T.** was the baby of five kids. She was full of smiles, joyful and positive. Like several of her friends whose lives were lost that day, she loved softball – and she practiced all the time. She was planning a visit to see her father **Eli** in the summer of 2022. The last time that she had spoken to her dad, she had told him how much she loved both him and her mother.

161.    **A.J.M.** was an outgoing sports nut with a wild sense of humor. He loved football and making his friends and family laugh with jokes and funny faces.

162.    On the morning of May 24, 2022, **L.M.S.** and her dad **Vincent** listened to "Sweet Child O' Mine" as he drove her to school. **L.M.S.** was the youngest of the family, with two big brothers. She loved running, and track was in her future. **L.M.S.** had her own style. Her mom **Melinda** loved to see what outfits she put together every day. **L.M.S.** and **Melinda** liked to go to the river and the park and feed the ducks together. **L.M.S.** was close with her dad **Vincent** too, from the very beginning. **Vincent** stayed home to take care of **L.M.S.** when she was born.

163.    With the end of the school year approaching, the morning of May 24, 2022 at Robb Elementary School was for awards. Robb students gathered grade by grade for assemblies to celebrate the year's hard work. Fourth graders went for their assembly at about 10:30 a.m.

164.    Proud parents in the audience watched as their children received honor roll certificates. After the ceremony, students posed for photos.

165.    **J.J.C.** blew her dad **Javier** a kiss goodbye in the hallway after the assembly.

166.    The fourth-grade teachers led their students back to the classrooms lining the hallways of the West building.

167.    Teacher Arnulfo Reyes walked with his eleven students back to Classroom 111. Teachers Eve Mireles and Irma Garcia took their eighteen students back to Classroom 112.



*Diagram of the Classrooms and Hallway Adjacent to Classrooms 111 and 112*

168.    Like most other classrooms in the building, Classrooms 111 and 112 shared a double-width interior door.

169.    In Classroom 111, the students went back to watching *The Addams Family* while Mr. Reyes did some work at his desk. They had started watching the movie earlier that morning before the assembly.

170.    In Classroom 112, teachers Eva Mireles and Irma Garcia and their students were watching *Lilo and Stitch.*

**G.    THE ACTIVE SHOOTER APPROACHES ROBB ELEMENTARY SCHOOL**

171.    At 11:28 a.m., a young man crashed his truck in a ditch approximately 100 yards from Robb Elementary School. His plan was to "shoot up" Robb Elementary School. (11:28 a.m.).

40

172.    The Shooter got out of the truck and started firing. (11:29 a.m.). The active shooter incident had begun.

173.    Uvalde's 911 dispatcher started to receive calls reporting shots fired. (11:29 a.m.).

174.    The Shooter climbed over the school's perimeter fence on the west side of the campus. (11:29 a.m.). He was now in the school parking lot adjacent to the West building.

175.    Uvalde's 911 dispatcher received a report that the Shooter was on the school campus. (11:29 a.m.).

176.    Uvalde Police Department ("UPD") broadcast via police radio that shots had been fired at Robb Elementary School. The broadcast asked all units to respond. (11:30 a.m.).

177.     Once a shot is fired at a school, it is an active shooter incident. As TXDPS Director McCraw has testified, "[w]hen a subject fires a weapon at a school he remains an active shooter until he is neutralized...." This was an active shooter incident.

178.    The UPD broadcast channel was accessible to all law enforcement in the area, including UCISD-PD, county, TXDPS, and federal officers. On information and belief, some or all UCISD-PD and TXDPS officers responding to the scene heard this broadcast and/or the others alleged herein on the UPD channel.

179.    **Defendant UCISD-PD Officer Gonzales** drove into the school parking lot where the Shooter was. (11:31 a.m.).

180.    **Officer Gonzales** heard gun shots, was advised of the Shooter's general location, and had time to respond to the Shooter. **Officer Gonzales** did nothing to delay or distract the Shooter. In clear violation of his active shooter training, **Officer Gonzales** did not immediately advance toward the Shooter's gun fire.

181.    The Shooter kept shooting from the school parking lot near the West building. Then he walked along the outside of the West building. He fired into Classroom 102, shattering parts of the exterior window. (11:32 a.m.).

182.    Inside Classroom 102, children lay flat on the floor.[1]

183.    The Shooter kept moving. He walked by the windows of Classrooms 103, 104, 105, and 106.

184.    All of those classrooms had students and/or teachers inside. In Classroom 106, the teacher hid her students and prayed.

185.    The Shooter fired three barrages into the exterior walls and windows of those classrooms. (11:32 a.m.).

---

[1] Allegations concerning the timing and sequencing of events inside the classrooms cannot be made with the same degree of specificity or certainty as allegations regarding most events taking place outside the classrooms. Plaintiffs therefore do not allege the time of events inside the classrooms.



*Diagram of Shooter's Movement Toward West Building*

186.     On information and belief, officers who had already arrived on scene and officers who were arriving on scene heard shots fired and knew this was an active shooter. (11:32 a.m.). At least one officer already on scene was armed with an AR-15 and extra magazines.

## H.     THE ACTIVE SHOOTER ENTERS ROBB ELEMENTARY SCHOOL WEST BUILDING

187.     The Shooter entered the West building via its northwest door, which was closed but unlocked. (11:33 a.m.).

188.     The Shooter walked into the northwest hallway, then turned right. Classrooms 111 and 112 were on his left; Classrooms 105 and 106 were on his right. He started shooting into Classroom 111 or 112 through the walls and turned left into the vestibule in front of those rooms.

189.     UPD radio broadcast that there was a shooter inside Robb Elementary School, that there was a shooting inside, and this was a "school shooting." (11:33 a.m.).

190.     In Classroom 111, Teacher Arnulfo Reyes heard a bang. He put the classroom in lockdown. He told the children to get under the table and act like they were asleep. He saw shrapnel come through the sheetrock walls of his classroom.

191.     One of the teachers in Classroom 112, either Eva Mireles or Irma Garcia, said, "we're on severe lockdown." A student turned off the movie. A teacher in Classroom 112 told students to hide, and they hid behind their teacher's desk, behind backpacks, and under a table.

192.     The Shooter entered either Classroom 111 or 112.[2]

193.     In Classroom 111, the students had hidden under a table so that they wouldn't be visible from the doorway.

194.     Teacher Reyes turned around and saw the Shooter. The Shooter fired at him. Mr. Reyes couldn't feel his arm, and fell to the floor, face down. The Shooter fired under the table, where children were. The Shooter kept firing into Classroom 111.

195.     On information and belief, nine-year-old **J.J.C.** was hit by shrapnel and bloodied but not fatally injured. **J.J.C.** lay among her wounded classmates.

196.     Bleeding on the floor, Mr. Reyes thought, "somebody's going to come help us."

197.     **Defendant TXDPS Sergeant Juan Maldonado** arrived on scene. (11:34 a.m.).

198.     In Classroom 112, the Shooter said, "It's time to die."

199.     The teachers in Classroom 112 attempted to protect their students with their bodies, standing in front of the children as the Shooter fired. He approached Teacher Irma Garcia, said, "goodnight," and shot her in the head. Teacher Eva Mireles fell to the floor wounded.

---

[2] Witness accounts differ about which classroom was breached first.

200.   Then the Shooter shot children and the whiteboard in Classroom 112.

201.   Bullet fragments hit **M.I.C.'s** head and shoulders. **M.I.C.** pretended that she was shot and fell down next to a classmate. **A.J.M.** was running to Classroom 112's backpack area, and he was shot in the leg.

202.   A UPD Sergeant approached the south doorway of the West building and transmitted over the radio, "Shots fired! Get inside! Go, go, go!" (11:35 a.m.). Gun smoke and a cloud of debris from drywall hung visibly in the hallway outside Classrooms 111 and 112. There were bullet holes in the walls and spent rifle casings on the floor.

203.   UPD and UCISD officers entered the building. They heard gunfire in Classrooms 111 and 112. They saw and smelled the gun smoke and drywall cloud. (11:35 a.m.). They knew this was an active shooter incident.

204.   Officers now inside the building included **Defendants UCISD-PD Officer Adrian Gonzales** and **UCISD-PD Chief Arredondo**.

205.   The Shooter fired another barrage of gunfire in Classrooms 111 and 112. The teacher in Classroom 106 heard screaming. Bullets came through the interior wall of her classroom, opposite Classroom 112.

## I.   DEFENDANT OFFICERS FROM THE TXDPS ARRIVE ON SCENE WITHIN TWO MINUTES OF THE SHOOTER ENTERING THE SCHOOL, WHILE THE SHOOTER IS SHOOTING INSIDE CLASSROOMS 111 AND 112

206.   **Defendant TXDPS Sergeant Juan Maldonado** arrived on scene within sixty seconds of the Shooter entering the West building. **Defendant TXDPS Trooper Elizondo** arrived on scene one minute after that.

207.   Unlike UPD and UCISD-PD responders, **Defendant Sergeant Maldonado and Defendant Trooper Elizondo** represented the TXDPS. According to its own website, TXDPS is

the "premier law enforcement agency" in the state of Texas, and "one of the finest in the nation." TXDPS total agency budget for the 2022 fiscal year was over $1.6 billion, of which $27,004,064 was allocated to the Texas Rangers alone. In comparison, the 2021-2022 budget for the **UCISD** had a total of $435,270 allocated to security and monitoring services, .3% of the TXDPS budget.

208.    TXDPS's mission is to "Protect and Serve Texas." TXDPS's role is to provide public safety capabilities that smaller law enforcement agencies in Texas either do not have or cannot sustain at the level and intensity needed. TXDPS's mandate includes responding to and taking responsibility over threats to public safety in Texas, including mass attacks in public places and individual radicalized violent actors. This role is crucial when active public safety threats occur in communities with smaller police departments that have less personnel and resources, like the active shooter incident at Robb Elementary School on May 24, 2022.

209.    Standards for TXDPS officers are high. Per TXDPS, "[a] Trooper must be educated, competent, and capable of handling every situation. A Trooper must be a problem-solver, a critical thinker, and must work independently." TXDPS officers are trained in active shooter response under the ALERRT protocols and in SWAT tactics.

210.    At least 91 officers from TXDPS responded to the active shooter incident at Robb Elementary School on May 24, 2022.

211.    Police sergeants typically coordinate and control front line responses and investigations, allocating resources, directing activities, managing risk, and reviewing progress of investigations. **Defendant TXDPS Sergeant Maldonado** had such supervisory authority over TXDPS troopers on scene.

212.     The Shooter began another barrage of gunfire inside the classrooms immediately after **Defendants Maldonado** and **Elizondo** arrived on scene and the UCISD-PD officers entered the building. (11:36 a.m.).

213.     On information and belief, although they could hear the active shooting inside the school, **Defendants TXDPS Sergeant Maldonado** and **TXDPS Trooper Elizondo** moved toward the school but hesitated outside in violation of active shooter training.

## J.     DEFENDANT UCISD-PD OFFICERS RETREAT, TRAPPING STUDENTS AND TEACHERS WITH THE ACTIVE SHOOTER, WHILE DEFENDANT TXDPS OFFICERS HESITATE

214.     **Defendant UCISD-PD Officers** were inside the West building; **TXDPS Defendants Maldonado** and **Elizondo** were hesitating just outside.

215.     A child in Classroom 111 called 911 and whispered, "help me." She said she was in Classroom 111. Dispatch told the child to stay on the line. (11:36 a.m.).

216.     Officers approached Classrooms 111 and 112. These officers included **Defendants UCISD-PD Chief Arredondo** and **UCISD-PD Officer Adrian Gonzales.**

217.     On information and belief, **UCISD-PD Chief Arredondo** and **UCISD-PD Officer Gonzales** saw the classroom doors.



*Classroom 112's Door, with Broken Window Glass and Bullet Holes from the Shooter*

218.     As officers, including **Defendants Arredondo** and **Gonzales**, approached Classrooms 111 and 112, they also saw the bullet holes in the walls and the 5.56 NATO rounds on the floor. One officer said, "it's an AR. It's an AR."

219.     As they approached the classrooms, the Shooter continued firing. An officer suffered a graze on his ear from shrapnel and another officer received a minor graze wound.

220.     All officers on scene, including Defendants, knew that a subject had fired a weapon at a school, and he was an active shooter until neutralized. ALERRT doctrine required that officers on scene immediately isolate and neutralize the Shooter in order to stop the killing and stop the dying.

221.     Officers, including **Defendants Arredondo** and **Gonzales**, rejected ALERRT doctrine. They stopped and then retreated. (11:36 a.m.). They abandoned wounded children and teachers in Classrooms 111 and 112, who remained locked down and still waiting for first responders to open the door.

222.   The UCISD-PD officers took positions at either end of the hallway, intentionally "containing" the Shooter so that he could not leave Classrooms 111 and 112. (11:36 a.m.).

223.   Electing to protect themselves in direct contravention of their training, the **UCISD-PD Defendants** trapped the locked down students and teachers in Classrooms 111 and 112 with the active shooter.

224.   **Defendant TXDPS Trooper Elizondo** was on the east side of the building and heard the gunfire inside the school. (11:36 a.m.).

225.   **Defendant TXDPS Sergeant Maldonado** was at the school's north hallway entrance at 11:37 a.m. On information and belief, **Defendant Maldonado** understood that the Shooter was firing in a classroom. But when another officer told him that they had to go in, Defendant Maldonado – in direct violation of ALERRT doctrine – signaled that officers in the hallway should wait because "DPS is sending people." (11:37 a.m.).

226.   Like the UCISD-PD Defendants, **TXDPS Defendants Maldonado** and **Elizondo** abandoned and endangered the children and teachers in Classrooms 111 and 112. Indeed, their betrayal of their training may be worse. **TXDPS Defendants Maldonado** and **Elizondo** did not even advance as far as the UCISD-PD defendants had.

227.   The Shooter fired approximately three more shots. (11:37 a.m.).

228.   A Uvalde Police officer reported, "we have him contained." (11:37 a.m.).

229.   In a phone call to dispatch, **Defendant UCISD-PD Chief Arredondo** said, "we don't have enough fire power right now it's all pistol and he has an AR15."

230.   It was clear to officers on the scene, including Defendants, that there was an active shooter who was at that moment targeting children and teachers in Classrooms 111 and 112 and that some of those trapped in the classrooms must already have been hit. The Shooter had fired

many rounds inside classrooms at a time when students were in attendance. It was also clear that by diverging from their training and prolonging the Shooter's time in the classrooms, officers were subjecting the children and teachers in those classrooms to excessive, deadly risk. Still, officers prioritized their own safety over the safety of the terrified, locked down students and teachers they were obligated to protect. The Defendants, including Defendants **TXDPS Sergeant Maldonado, TXDPS Trooper Elizondo, UCISD-PD Chief Arredondo** and **UCISD-PD Officer Gonzales,** confined the Shooter in Classrooms 111 and 112 and continued the lockdown of students and teachers in those classrooms.

## K.   THE UVALDE COUNTY DISTRICT ATTORNEY'S OFFICE ALERTS DEFENDANT TXDPS RANGER KINDELL ABOUT THE ACTIVE SHOOTING

231.   On the morning of May 24, 2022, Defendant Ranger Kindell was working from home. He received a call from the Uvalde County District Attorney's Chief Investigator alerting him about a possible active shooter incident. (11:32 a.m.).

232.   The District Attorney's Investigator's call to **Defendant Ranger Kindell** was no accident. Rangers are an elite division of the Texas Department of Public Safety. Of the thousands of law enforcement officers in the state of Texas, only 166 are commissioned Rangers. "A Ranger is an officer who is able to handle any given situation without definite instructions from his commanding officer or higher authority," according to the Ranger's website. Texas Rangers have jurisdiction everywhere and anywhere in Texas.

233.   **Defendant Ranger Kindell** had approximately fifteen years of experience as a TXDPS officer, as well as rapid response training and training on how to teach civilians to respond to active shooters.

234.    **Defendant Ranger Kindell** had the authority to exercise de facto supervisory authority over TXDPS, UPD, UCISD-PD and county law enforcement officers. On information and belief, he began acting in a supervisory capacity immediately upon receiving the 11:32 call.

235.    **Defendant Ranger Kindell's** supervisor was **Defendant TRD Lieutenant Randy Garcia**.

236.    Upon receiving the call from the Uvalde District Attorney's Chief Investigator, **Defendant Ranger Kindell** called **Defendant TRD Lieutenant Randy Garcia** to update him on the situation. **Defendant Garcia** in turn called his supervisor, **Defendant TRD Major Robert Smith,** to notify him of the reported active shooter.

237.    **Defendant Ranger Kindell** called a UPD Sergeant who was on scene to get more information. The UPD Sergeant told **Defendant Kindell** that the Shooter was shooting in the classroom and requested shields, equipment, and rifles. On information and belief, **Defendant Kindell** did not direct the UPD Sergeant to immediately follow ALERRT protocols to isolate and neutralize the Shooter. Instead, **Defendant Kindell** indicated that it was acceptable to wait until more resources arrived before engaging the Shooter.

238.    **Defendant TRD Lieutenant Randy Garcia** called **Defendant Ranger Kindell** back and received confirmation from **Defendant Kindell** that there was indeed an active shooter. **Defendant Garcia** then relayed that confirmation to **Defendant TRD Major Robert Smith**.

239.    From the time **Defendant Kindell** first learned of the active shooter incident to the time the Shooter was neutralized, **Defendant Kindell** was in frequent communication with his supervisor, **Defendant Garcia,** and at least 19 phone calls between the two of them, lasting a total of approximately 25 minutes, were made during that time period. **Defendant Garcia** regularly

relayed the information he received from **Defendant Kindell** to **Defendant TRD Major Robert Smith**.

## L.   OFFICERS, INCLUDING DEFENDANTS, KNEW THERE WERE STUDENTS AND TEACHERS IN CLASSROOMS 111 AND 112 AND THEY KEPT THOSE STUDENTS AND TEACHERS TRAPPED WITH THE SHOOTER

240.   Teacher Eva Mireles, one of the teachers in Room 112, was lying wounded on the floor of Classroom 112. Her students saw her bleeding. She managed to call her husband, UCISD-PD Officer Rubin Ruiz. She told him she was shot. UCISD-PD Officer Ruiz told multiple officers that the shooting was happening in his wife's classroom. (11:37 a.m.)

241.   All officers in the northside hallway heard, knew and understood that there was a teacher locked down in the classrooms with the Shooter. Regardless, they continued to confine students and teachers in Classrooms 111 and 112 with the active shooter.

242.   A UPD Sergeant repeated, "we have got to get in there."

243.   A Border Patrol Agent arrived and positioned himself along the wall at the T intersection at the north end of the hallway. (11:38 a.m.).

244.   **Defendant TXDPS Captain Joel Betancourt** obtained confirmation that that there was a shooting at Robb Elementary School and headed there.

245.   An officer commented over the radio "I have a male subject with an AR." (11:39 a.m.).

246.   The UPD Acting Chief radioed for "any agency available" to come out and help. (11:39 a.m.).

247.   In Classroom 102, a teacher called 911. She said they were locked down in the classroom and that she believed someone was shot in another classroom in the building. (11:40 a.m.).

248.    One minute later, the UPD radio broadcast, "Male subject is still shooting." On information and belief, **Defendant TXDPS** and **UCISD-PD Officers** at the scene and responding to the scene heard this transmission. (11:41 a.m.).

249.    Emergency medical responders arrived in front of the school. (11:41 a.m.).

250.    **Defendant TXDPS Trooper Elizondo** finally entered the West building. She had previously been standing outside of the doorway (11:41 a.m.).

251.    A teacher in Classroom 102 texted her husband, a Border Patrol Agent: "There's an active shooter. Help. Love you." (11:41 a.m.).

252.    UPD radio broadcast that there was a possible gunshot victim in a classroom. (11:41 a.m.). On information and belief, **TXDPS Defendant** and **UCISD-PD Defendant** officers at the scene and responding to the scene heard this transmission. They knew that they had trapped the Shooter with the victim and cut her off from help, and that they were continuing her entrapment without medical assistance.

253.    Family members of children started arriving, congregating near a funeral home across Geraldine Avenue from Robb Elementary School's West building. Law enforcement officers, however, created a perimeter and prevented those parents from coming through to the West building. (11:41 a.m.)

254.    UPD radio broadcast that class in Classroom 112 "should be in session right now … the class should be in session right now." (11:42 a.m.). On information and belief, **TXDPS Defendant** and **UCISD-PD Defendant** officers at the scene and responding to the scene heard this broadcast. This broadcast confirmed what officers already knew: that they had trapped the Shooter with students and teachers in Classrooms 111 and 112, and that every second they failed to act prolonged the risk to those students and teachers locked down with the Shooter. On

information and belief, the **UCISD-PD Defendants** and all **TXDPS Defendants** at or responding to the scene heard this transmission.

255.    **Defendant TXDPS Trooper Elizondo** was present in the West building. (11:42 a.m.).

256.    **Defendant TXDPS Sergeant Maldonado** entered the West building through the west door. (11:43 a.m.).

257.    A girl in Classroom 112 said something. She may have said, "Officers, help us." The Shooter heard her. He walked over to her and shot her. (The timing of this shot cannot yet be alleged, although it seems likely it was the shot at 11:44 a.m.).

258.    All officers inside and outside the West building heard a shot. (11:44 a.m.).

259.    An unknown law enforcement officer at the northwest entrance said that the Shooter was in a classroom "with kids." (11:45 a.m.).

260.    The Shooter sat at Teacher Arnulfo Reyes' desk in Classroom 111. Sometimes he kicked children's bodies and mocked them. He dropped Teacher Reyes' cell phone on his back and dribbled water on him to see if he would move.

## M.    OFFICERS, INCLUDING DEFENDANTS, STOP PARENTS FROM RESCUING THE CHILDREN TRAPPED INSIDE CLASSROOMS 111 AND 112

261.    As the incident progressed, parents learned of the danger to their children. They came to the school, where law enforcement had set up a perimeter. Parents begged the officers to save their children. Then parents tried to save their children themselves. Officers physically restrained parents and family members from getting closer to the school.

262.    Parents told law enforcement officers kids were inside. (11:46 a.m.). Parents told officers, "Either you go in or I'm going in."

263.    When parents tried to break through the law enforcement perimeter, law enforcement officers, including TXDPS and Uvalde County Sheriff's Office ("UCSO") officers stopped them.

264.    One man surrounded by law enforcement officers was knocked down. As he lay on his back on the ground, at least two **TXDPS Doe Defendant officers** stood over him and prevented him from getting up, while several officers in the immediate vicinity watched.

265.    One parent attempting to reach her children was handcuffed and another was tasered by a law enforcement officer.

266.    One officer aimed a rifle at **Plaintiff M.I.C.'s** father, **Plaintiff Miguel Cerrillo**, and told him and other parents to get away.

267.    Decedent **J.J.C.'s** dad **Plaintiff Javier Cazares** waited as close to the West building as he could, trying to understand what law enforcement officers were doing. If he had known they were trapping the Shooter in **J.J.C.'s** classroom, with her inside, he would have done everything in his power to get to her.

268.    The officers' conduct was cruel. **Defendant Trooper Elizondo** later admitted, "If my son had been in there, I would not have been outside. I promise you that." And yet officers stopped parents, ensuring that parents could not reach their children.

269.    On information and belief, **Defendant Captain Joel Betancourt** ordered all **TXDPS** personnel to be on the perimeter and not enter the building.

**N.     OFFICERS SAVED THEMSELVES, NOT CHILDREN, FROM THE SHOOTER'S LETHAL BATTLE RIFLE**

270.    The Shooter was armed with a Daniel Defense DDM4v7, an AR-15 style rifle, and multiple high-capacity 30-round magazines containing NATO 5.56 cartridges.

271.    ALERRT doctrine makes no exceptions for AR-15s. AR-15 style rifles are renowned for the size and severity of the wounds they produce and the likelihood that the rounds they fire will pierce body armor, walls, and other barriers. The command to "stop the killing, stop the dying" is even more urgent when an active shooter is using an AR-15.

272.    The AR-15's presence and power could be felt from the first moment officers entered the West building. 5.56 NATO rounds from the Shooter's AR-15 had penetrated the classroom walls into the hallway. Officers noted that the Shooter had an AR-15 at 11:36 a.m.

273.    A UPD Sergeant got on his radio to warn others. "I have a male subject with an AR," he said. "Fuck," an officer replied, "AR," another exclaimed, alerting others nearby.

274.    The presence of the lethal AR-15 paralyzed the response. A UPD officer commented later, "I knew too it wasn't a pistol. ... I was like, 'Shit, it's a rifle,'" he said. He added, "The way he was shooting, he was probably going to take all of us out." Officers reasoned there was "no way" to take action, and the only thing they could do was wait. One UPD Sergeant said, "You knew that it was definitely an AR.... There was no way of going in.... We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him." ALERRT doctrine utterly rejects this excuse for delay. In an active shooter incident, the only choice is immediate isolation and neutralization of the shooter, because that is the only action that stops the killing and stops the dying.

275.    Officers did not want to move forward until they had rifle-rated shields. A UPD Lieutenant later said, "[you] can only carry so many ballistic vests on you. That .223 (caliber) round would have gone right through you." **Defendant UCISD-PD Chief Arredondo said he** "need[ed] lots of firepower" because of the Shooter's AR-15.

276.    **Defendant TXDPS Sergeant Maldonado** was with troopers outside the West building. He said, "This is so sad dude…. He shot kids bro." Officers standing with him discussed that they knew this was something that needed to be done "now" and "ASAP." **Defendant TXDPS Officer Richard Bogdanski** asked, "You know what kind of gun?" and an officer responded "AR, he has a battle rifle." "What's the safest way to do this? I'm not trying to get clapped out," **Defendant Bogdanski** replied.

277.    These same officers knew that the Shooter had used his AR-15 to unleash barrages of fire on teachers and students. Every minute that officers waited on rifle-rated shields, "lots of firepower," and even aerial support, children and teachers faced the Shooter with no protection at all.

## O.    OFFICERS, INCLUDING DEFENDANTS, ARE INDIFFERENT TO THE FACT THAT A TEACHER IS DYING INSIDE CLASSROOM 112

278.    Three Border Patrol agents entered through the northwest door carrying ballistic shields and other equipment. (11:51 a.m.).

279.    Although he knew students and teachers were confined with the active Shooter in Classrooms 111 and 112 and had heard the Shooter fire repeatedly, **Defendant UCISD-PD Chief Arredondo** intended to "start negotiations" with the Shooter. (11:55 a.m.).

280.    **Defendant TXDPS Special Agent Luke Williams** entered the West building through the east door. (11:55 a.m.).

281.    **Defendant Ranger Kindell** arrived on scene. (11:55 a.m.). On information and belief, **Defendant Ranger Kindell's** wife was a teacher at another school district in Uvalde County, and he was familiar with school lockdown procedures. He was therefore familiar with the lockdown procedures that require children and teachers to stay quiet and hidden during lockdowns.

282.    Officer Ruiz tried again to save his wife, Eva Mireles, and the students who were with her in Classroom 112. He told officers in and around the West building that his wife, a teacher in Classroom 112, had been shot. Officers were indifferent to her plight. They stopped Officer Ruiz from entering Classrooms 111 and 112, took his weapon and escorted him out the door. (11:56 a.m.).

283.    **Defendant Ranger Kindell** entered the west door of the West building. **Defendant Kindell** was on the phone with **Defendant TRD Lieutenant Garcia** at this time (11:57 a.m.).

284.    Inside the West building, **Defendant TXDPS Special Agent Luke Williams** was in the hallway outside of one of the classrooms with two other **Doe Defendant TXDPS officers.** (11:57 a.m.).

285.    While driving to Robb Elementary School, **Defendant TXDPS Captain Betancourt** spoke with a Uvalde County Sheriff for updates.

286.    By 11:59 a.m., at least eight TXDPS officers and at least seven Border Patrol agents and one US Marshal had been in or were currently inside of the West building.

287.    **Defendant UCISD-PD Chief Arredondo** again attempted to negotiate with the Shooter from the hallway. (11:59 a.m. – 12:01 p.m.).

288.    Inside Classroom 111, Teacher Arnulfo Reyes heard the police speaking to the Shooter and attempting to negotiate.

289.    On the west side of the West building, **Defendant Ranger Kindell** assisted children and a teacher out of an exterior window. **Defendant Kindell** told a police officer that "DPS assets" were on the way.

290.    A child in classroom 112 called 911. The child pleaded for help. The call lasted one minute. (12:03 p.m.).

291.   **Defendant Ranger Kindell** spoke with Officer Ruiz, who was white as a ghost. Officer Ruiz told **Defendant Ranger Kindell** that his wife just called him and said she had been shot and was dying. Officer Ruiz told **Ranger Kindell**, "she's in there." **Defendant Kindell** then walked away. During this interaction, **Defendant Kindell** was also on the phone, on information and belief with his supervisor, **Defendant TRD Lieutenant Garcia**.

292.   Officers evacuated children from some classrooms in the West building. Like the children in Classrooms 111 and 112, those children and teachers had stayed still and silent, waiting for first responders to open the door, exactly as the lockdown drill requires.

293.   **Defendant Ranger Kindell** ordered that TXDPS send all troopers available to assist with crowd control. (12:06 p.m.).

294.   Parents were moving toward the northwest corner of the school. Some were armed. Officers stopped them. (12:07 p.m.).

295.   **Defendant Ranger Kindell** texted a TXDPS Aircraft Operations Division Pilot Lieutenant: "Active school shooter, need DPS air." (12:08 p.m.).

296.   **Defendant Ranger Kindell** was overheard on video stating that the Shooter was shooting at whoever was in the hallway.

297.   **Defendant TXDPS Captain Joel Betancourt** texted **TXDPS Defendant Regional Director Escalon** that a teacher was possibly shot in the head, troopers who were medics had been deployed, and indicated that he intended to wait for drones and TXDPS negotiators to arrive rather than breaching Classrooms 111 and 112 immediately. (12:09 p.m.).

## P.   PLAINTIFF M.I.C. CALLS 911 FROM INSIDE CLASSROOM 112 AND OFFICERS ARE INDIFFERENT TO HER CRY FOR HELP

298.   In Classroom 112, Plaintiff **M.I.C.** had covered herself in her friend's blood so the Shooter would believe she was dead.

299.  **M.I.C.** and her friend knew some of the wounded in Classroom 112 were running out of time. They had watched one of their classmates be shot as she tried to call 911. But their teacher Eva Mireles was dying. They quietly took a teacher's phone and called 911. (12:10 p.m.).

300.  On information and belief, **Defendant Ranger Kindell** told other officers that he had someone in the building who would handle going into the classrooms.

301.  On information and belief, the UPD Acting Chief deferred to **Defendant Ranger Kindell,** understanding that he had taken command. (12:10 p.m.). Other UPD officers did the same. (12:11 p.m.).

302.  **Defendant Ranger Kindell** updated **Defendant TRD Major Robert Smith** by phone. (12:11 p.m.).

303.  UPD radio broadcast that a child had called 911 and was in a room full of victims. This transmission was heard on both sides of the hall and outside the building. (12:12 p.m.).

304.  U.S. Border Patrol Tactical Unit ("BORTAC") Acting Commander, who was now inside the building, was told that there were victims inside Classrooms 111 and 112. (12:13 p.m.). In a post-incident statement, he said he was advised "that the subject had possibly shot multiple children and was still in the classroom."

305.  Officers prolonged the lockdown looking for keys (which they did not need because the door to Classroom 111 was not locked). (12:13 p.m.).

306.  **M.I.C.** and her friend whispered to the 911 dispatcher that their teacher was still alive and needed help. They asked for help. (12:13 p.m.).

307.  Dispatch alerted officers in the West building. The UPD Acting Chief said, "a child just called. They have victims in there. Called 911." (12:13 p.m.).

308.    The children in Classroom 112 were trying to keep quiet, but some were wounded, and they were all terrified. One teacher was dead, and one was dying. There was no one to help them stay quiet. **M.I.C.** and her friend told 911, "send an ambulance right away." (12:14 p.m.).

309.    They said to please hurry. Their teacher was about to die. (12:15 p.m.). They asked, should they open the door? They were trying to save their teacher's life. They knew she needed help. Dispatch told them to stay quiet. They said that their teacher wouldn't stay quiet. (12:16 p.m.).

310.    Dispatch said they are sending officers, but no help came. (12:17 p.m.).

311.    **M.I.C.** and her friend said officers need to come now, but no one came. (12:18 p.m.).

312.    Dispatch continued to tell them not to open the door. (12:19 p.m.).

313.    The Shooter was in Classroom 111. He shot Teacher Arnulfo Reyes in the back. Then he shot at the children under the table again. On information and belief, a round struck **J.J.C.** directly.

314.    In Classroom 112, **M.I.C.** and her friend were still on the phone with 911 dispatch. They said, "he's shooting." Dispatch told them to stay quiet. (12:21 p.m.).

315.    Defendant officers heard the shots. They already knew children and a teacher were alive and trapped inside; now they knew he was shooting at them again.

316.    On the south side of the hallway, **Defendant UCISD–PD Chief Arredondo** continued to try to negotiate with the Shooter, "can you hear me, sir? Can you hear me, sir?" (12:21 p.m.).

317.    **Defendant Texas Ranger Kindell** heard the gunfire while he was on the phone with **Defendant TRD Lieutenant Garcia**. On information and belief, **Defendant Garcia** heard

the gunfire over the phone and was aware of the situation. **Defendant Kindell** had been on scene for approximately 28 minutes. He was now in the West building, also planning to negotiate with the Shooter, in direct violation of ALERRT protocols. On information and belief, **Defendant Kindell** knew negotiation would continue to trap students and teachers who were still alive in Classrooms 111 and 112 with the Shooter. On information and belief, **Defendant Garcia** did not direct **Defendant Kindell** to immediately follow ALERRT protocols to isolate and neutralize the Shooter. (12:23 p.m.).

318.    **Defendant UCISD-PD Chief Arredondo** was indicted in part for "[d]eciding to negotiate and attempting to negotiate" with the Shooter while the Shooter was "hunting and shooting a child or children in Room 112." The actions of **Defendants Kindell and Garcia** are even more culpable than those of Chief Arredondo, given their superior training, experience and resources.

319.    Officers continued to try to find a key that would work on the doors to Classroom 111 and 112, even though the door to Classroom 111 was unlocked. (12:23 p.m.). No one checked the doors of Classrooms 111 or 112 to confirm that they were actually locked.  Nobody called Principal Gutierrez to ask about the location of a master key.  She had a key, and the head custodian had a key. Yet despite all the effort to find a key, nobody called her.

320.    A BORSTAR medic said to officers in and near the West building, "the victims have been bleeding for a while." (12:24 p.m.). Officers still did not permit the medic to approach Classrooms 111 and 112.

321.    An officer said, "There's a teacher shot in there." Another officer responded, "I know." (12:27 p.m.).

322.    **Defendant TXDPS Captain Betancourt** arrived on scene. (12:30 p.m.).

323.    **Defendant Ranger Kindell** called **Defendant TRD Major Smith** (12:32 p.m.).

324.    A body camera worn by a UPD Sergeant recorded that somebody asked at 12:34 p.m., "we don't know if he has anyone in the room with him, do we?" **Chief Arredondo** responded, "I think he does. There's probably some casualties." Sgt. Coronado agreed, saying "yeah, he does . . . casualties."

325.    Twenty-one more minutes elapsed, while officers, including **Defendant Ranger Kindell** and all **TXDPS Defendants** and **UCSID-PD Defendants** continued to contain the Shooter with living children and teachers in Classrooms 111 and 112.

326.    The BORTAC Commander organized a team to enter Classrooms 111 and 112. **Chief Arredondo** did not exercise tactical command over the BORTAC team, nor did the BORTAC team seek instruction from **Chief Arredondo**.

327.    On the radio, **Defendant TXDPS Captain Betancourt** asserted authority over the breaching team, ordering: "Hey, this is DPS Captain Betancourt. The team that's going to make breach needs to stand by. The team that's gonna breach needs to stand by." (12:48 p.m.).

328.    Finally, at 12:49 p.m. – over 73 minutes since officers first confined the Shooter with the students and teachers in Classrooms 111 and 112 – the team lead by the BORTAC Commander opened the door to Classroom 111, ending the lockdown. (12:49 p.m.). The Shooter was killed, and no one on the entry team was seriously injured. (12:50 p.m.).

## Q.    OFFICERS' DECISION TO CONTAIN THE SHOOTER WITH HIS VICTIMS CAUSED CHILDREN TO SUFFER AND DIE

329.    Officers, including **Defendants TXDPS Sergeant Maldonado, TXDPS Trooper Crimson Elizondo, UCISD–PD Chief Arredondo,** and **UCISD–PD Officer Gonzales,** were on scene by 11:35 a.m., while the Shooter was firing in Classrooms 111 and 112. **Defendant Kindell**

was told this was an active shooter incident at approximately 11:35 a.m., acted in a supervisory capacity from that moment forward, and arrived on scene at 11:59 a.m.

330.    **Defendant Ranger Kindell's** supervisors, including **Defendant TRD Lieutenant Garcia** and **Defendant TRD Major Smith,** were regularly updated on May 24, 2022 and acted in a supervisory capacity as to **Defendant Kindell's** actions on scene and possibly the actions of others.

331.    **Defendant TXDPS Captain Betancourt** had knowledge of the scene and exercised authority sufficient to assert command over the breach team, ordering a delay of the breach.

332.    **Defendant TXDPS THP Captain Simpson** acted in a supervisory capacity on scene and understood what the different TXDPS personnel were doing in their response to the shooting. Later on, when **Defendant TXDPS Regional Director Escalon** arrived on scene, he met with **Defendant TXDPS THP Captain Simpson** for an overview on TXDPS personnel.

333.    During the active shooter incident, the **TXDPS Defendants** continued to act on their own authority. They did not defer to **Chief Arredondo** as incident commander, and he did not consider himself to have assumed incident command.

334.    At 11:36 a.m., officers approached Classrooms 111 and 112 to breach the doors. When the Shooter fired and two officers were hit by shrapnel, they retreated instead of isolating and neutralizing the Shooter. Defendants on scene and with command authority over the scene violated elementary and clearly established active shooter doctrine by delaying confrontation with the Shooter. Their delaying conduct turned the lockdown of Classrooms 111 and 112 into a death trap for students and teachers.

335.   The Defendants' actions gave the Shooter leisure to torture and traumatize his victims. Children watched the Shooter tell classmates, "It's time to die," and shoot them. Using the victims' blood as ink, the Shooter wrote "LOL," on the whiteboard in Classroom 111. On information and belief, the Shooter mocked wounded children and kicked them to see if they were dead.

336.   During those 73 minutes, the Shooter fired 19 more times: eleven shots over 53 seconds at 11:36 a.m.; three shots at 11:37 a.m.; one shot at 11:44 a.m.; and four shots at 12:21 p.m.

337.   One of those shots was fired at close range into teacher Arnulfo Reyes' back, as he lay prone on the floor in Classroom 111.

338.   On information and belief, one shot fatally wounded **Plaintiff J.J.C.**, who otherwise would have survived.

339.   One shot killed the child in Classroom 112 whom the Shooter heard asking for help. On information and belief, that child was **Plaintiff A.J.G.**.

340.   On information and belief, the remaining 16 shots were aimed at children, including the **Child Plaintiffs**, and some or all of those shots wounded or killed one or more of the **Child Plaintiffs**.

341.   In addition to enabling the Shooter to fire 19 rounds at his victims at close range, Defendants' actions denied wounded victims, including the **Child Plaintiffs**, crucial medical care.

342.   On information and belief, earlier medical intervention could have saved at least one of the **Child Plaintiffs**.

343.   Some **Child Plaintiffs** died while the Shooter terrorized them.

344.   The **Child Plaintiffs** who survived will never be the same.

345.  **Plaintiff M.I.C.** still has shrapnel in her shoulders. **M.I.C.** heard and sometimes saw the Shooter continue to shoot her friends and teacher. As a result, **M.I.C.** now suffers extreme trauma.

346.  **Plaintiff A.J.M.** still has bullet fragments in his leg. Like **M.I.C., A.J.M.** also heard and sometimes saw the Shooter continue to shoot his friends and teacher. **A.J.M.** also now suffers from extreme trauma.

## R.  PLAINTIFFS HAVE RECEIVED LITTLE TRANSPARENCY AND NO ACCOUNTABILITY

347.  Plaintiffs are grieving an unimaginable loss. Responding law enforcement officers' betrayal of their children's trust – and theirs – increased their suffering exponentially. The officers and departments that failed these children owe plaintiffs complete transparency and full accountability, and again they have failed these families. To date, they have provided little transparency and no accountability.

348.  Each responding law enforcement agency, including the TXDPS, has some or all of the following records that show exactly what was done by whom on May 24, 2022: body camera footage, recordings of radio communications, dispatch transmission recordings and logs, and recorded and/or written statements of responding officers and victims.

349.  TXDPS has acknowledged that complete transparency is the right thing to do. Facing early public outrage about the law enforcement response, TXDPS Director McCraw promised, "When we get the ability to come talk to you, I'll go line by line in terms of what trooper did what …. what DPS officer. We'll be entirely transparent," and "[t]he public will have it – they'll have excruciating details in terms of what we did, when we did it and those gaps."

350.    TXDPS has broken its promise of transparency. In the more than two years since the shooting, the TXDPS has fought in court to conceal its body camera footage and radio traffic from Uvalde's victims and the public.

351.    At the same time, TXDPS defendants sued in other cases arising from the Shooting have taken the position that they will provide no discovery until their motions to dismiss are resolved.

352.    The Texas Rangers investigated the response to the shooting, including the actions of the 91 responding TXDPS officers. In August 2022, the Texas Rangers asked Dr. Mark Escott, Medical Director for TXDPS and Chief Medical Officer for the City of Austin, to look into the injuries of the victims and determine whether any victims could have survived. The request was apparently a delaying tactic, not a search for the truth. Dr. Escott was never given access to autopsy reports or hospital and EMS records. A year later, the Rangers told Dr. Escott they were "moving in a different direction" and no longer wanted the analysis to be performed.

353.    The TXDPS delivered a final report to the Uvalde County District Attorney so that she could determine whether to press charges. The TXDPS chose not to make that report public.

354.    The Uvalde County District Attorney has provided the TXDPS with another means to delay and avoid transparency. The District Attorney refuses to release crime scene photos, ballistics analysis, autopsies, and other information that would enable Plaintiffs to allege with greater specificity what happened in Classrooms 111 and 112.

355.    Nor has the TXPDS held any of its officers fully to account for their actions. Minutes of a state police captains' meeting document Director McCraw as telling his officers, "no one is going to lose their jobs" for their conduct during the shooting.

356.     **Defendant Kindell** was suspended in September 2022 for failing to perform his duties and was issued a preliminary termination letter by TXDPS Director McCraw in January 2023. **Defendant Kindell** was given the opportunity to meet with McCraw before the termination decision was finalized, but according to a TXDPS spokesperson, that meeting will not occur until the grand jury has made a decision on criminal charges. **Defendant Kindell** continues to draw a Ranger's salary.

357.     **Defendant Elizondo** resigned from TXDPS while under investigation for actions inconsistent with training and Department requirements in connection with her response at Robb Elementary on May 24, 2022.

358.     **Defendant Maldonado** was served termination papers by TXDPS in October 2022 following an investigation into his actions at Robb Elementary on May 24, 2022. TXDPS did not disclose the grounds for his termination. TXDPS ultimately did not terminate **Defendant Maldonado** and allowed him to retire instead.

359.     **Defendant Betancourt's** actions at Robb Elementary on May 24, 2022, were investigated by TXDPS, but he remains employed with the agency.

360.     TXDPS has intentionally concealed the involvement, and the extent of the involvement, of **TXDPS Defendants Randy Garcia**, **Robert Smith**, **Jerry Simpson**, and **Noe Fernandez** from the public and from Plaintiffs. It succeeded in concealing the identities and actions of **Defendants Randy Garcia**, **Robert Smith**, **Jerry Simpson**, and **Noe Fernandez** from Plaintiffs until after May 24, 2024.

361.     To date, not one person from TXDPS has been fired in connection with their response to the shooting at Robb Elementary on May 24, 2022.

362.     A total of 376 law enforcement officers had responded to the active shooter incident at Robb Elementary School: 91 TXDPS officers, 26 officers from the UPD, 179 officers from federal agencies, county sheriffs and constables from Uvalde and elsewhere, and the five UCISD-PD officers.

## V.     FIRST CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTEENTH AMENDMENT, SUBSTANTIVE DUE PROCESS CLAUSE/SPECIAL RELATIONSHIP)

363.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

364.     The **TXDPS Defendants** and individual **UCISD-PD Defendants** responded to an active shooter incident at a school.

365.     On information and belief, and as previously alleged, even before they arrived on scene these Defendants knew and/or were aware of the very substantial risk that this was an active shooter incident in a school, and that their duty was to neutralize the Shooter immediately.

366.     On information and belief, and as previously alleged, as these Defendants arrived on scene, and/or received additional updates from the scene, they received additional information confirming that this was an active shooter incident.

367.     Defendants knew that the students and teachers in all classrooms at Robb Elementary School – including Classrooms 111 and 112 – were required to and would follow lockdown procedures and that those lockdown procedures required those children and teachers to remain in their classrooms until authorized by law enforcement personnel to leave.

368.     When Defendants arrived on scene, they took control of the physical location of the Shooter and the children and teacher who were his victims. They confined the Shooter to Classrooms 111 and 112. They confined three teachers and twenty-nine students with him.

69

369.     Each Defendant knew that the **Child Plaintiffs** were unable to provide for their own safety when confined to a classroom with an active shooter carrying an AR-15.

370.     Defendants also set up and enforced a perimeter around the school.

371.     Each Defendant knew and intended that this law enforcement perimeter would prevent parents from reaching their children inside Robb Elementary School.

372.     Each Defendant knew that their actions were preventing the **Child Plaintiffs'** parents and/or their parents' spouses from reaching Classrooms 111 and 112 to provide safety from the Shooter.

373.     Defendants affirmatively prevented the **Child Plaintiffs'** parents and/or their parents' spouses from taking action to attempt to save their loved ones.

374.     Medics arrived on scene to provide life–saving care for those wounded by the Shooter.

375.     Each Defendant knew that their actions were delaying medics from reaching Classrooms 111 and 112 and knew of the substantial risk that they were exposing the wounded in those classrooms to serious injury or death.

376.     For any and all of these reasons and as previously alleged, Defendants assumed a special relationship with the trapped children and teachers for purposes of the Fourteenth Amendment. State-mandated lockdown drills required children to remain in the classroom until authorized to leave by law enforcement officers. Following those drills, children stayed still and silent. Finally, in desperation, they called 911 and begged for help and permission to leave and were told by dispatchers to remain in place. Parents were not permitted to provide protection to their children either. Law enforcement officers ensured through their actions that no person would

be permitted to rescue or protect the children and their teachers other than law enforcement officers.

377.     Each Defendant knew that students and teachers in Classrooms 111 and 112 were confined with the Shooter, unable to provide for their own safety, and cut off from receiving assistance from their parents, medics or anyone but law enforcement. Thus each Defendant knew students and teachers in Classrooms 111 and 112 were in their custody.

378.     While in Defendants' custody, the **Child Plaintiffs** had constitutional rights to be free from bodily harm, abuse, and psychological torture.

379.     Each Defendant violated those rights of the **Child Plaintiffs**.

380.     Each Defendant acted with deliberate indifference to the plight of the **Child Plaintiffs**.

381.     Each Defendant knew and understood that the longer locked down children and teachers remained trapped with the Shooter, the more students and teachers were likely to die, either because the Shooter would find them and shoot them, or because they would succumb to wounds that he had already inflicted.

382.     The known and obvious consequences of each Defendant's actions were that the students and teachers in their custody would be shot, deprived of life-saving medical care, and terrorized by the Shooter.

383.     In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions.

384.     These actions by the **TXDPS Defendants** and individual **UCISD–PD Defendants** resulted in the death, wounding, and/or psychological terror of the **Child Plaintiffs**.

385.     If these Defendants, or any one of them, had acted to protect the reasonable safety of the **Child Plaintiffs**, one or more of the **Child Plaintiffs** would not have died.

386.     If these Defendants, or any one of them, had acted to protect the reasonable safety of the **Child Plaintiffs**, one or more of the **Child Plaintiffs** would have been spared the emotional torture of being in their classrooms with the Shooter waiting for help that did not come.

387.     Further, had parents been able to reach the West building, they or law enforcement officers would have breached the classrooms and neutralized the Shooter well before 12:49 p.m., and emergency personnel would have been able to enter the classrooms and provide emergency medical services to wounded children.

388.     If such intervention had occurred, one or more of the **Child Plaintiffs** would not have died.

389.     If parents had breached the classrooms, they would have been able to comfort one or more **Child Plaintiffs** who were wounded and possibly dying. Instead, one or more **Child Plaintiff** died terrified and without comfort.

390.     If parents had breached the classrooms, one or more of the **Child Plaintiffs** would have been spared emotional torture and trauma.

391.     Further, these actions by the **TXDPS Defendants** and the individual **UCISD-PD Defendants** deprived the **Parent Plaintiffs** of the right to protect their children from the active shooter and to aid and comfort one or more of the **Child Plaintiffs**.

392.     As a direct and proximate result of these police actions, Plaintiffs sustained the damages hereinafter alleged.

**VI.** **SECOND CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER)**

393.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

394.    The **TXDPS Defendants** and the individual **UCISD-PD Defendants** created an environment dangerous to the **Child Plaintiffs**.

395.    These Defendants knew the environment was dangerous to the **Child Plaintiffs**.

396.    These Defendants created an opportunity that would not have otherwise existed for the Shooter to harm one or more of the **Child Plaintiffs**.

397.    These Defendants' actions caused the **Child Plaintiffs** to be exposed to acts of violence by the Shooter, and increased the risk that the **Child Plaintiffs** would be exposed to such acts of violence.

398.    These Defendants' actions placed the **Child Plaintiffs** specifically at risk.

399.    These Defendants knew or should have known that their actions were specifically endangering students and teachers in Classrooms 111 and 112, including the **Child Plaintiffs**.

400.    The harm to the **Child Plaintiffs** caused by these Defendants' actions was foreseeable and direct.

401.    The known and obvious consequences of each of these Defendant's actions was that the students and teachers in their custody would be shot, deprived of life–saving medical care, and terrorized by the Shooter.

402.    In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions.

403.    Each Defendant's actions caused the death, wounding, and/or psychological torture and trauma to one or more of the **Child Plaintiffs**.

73

404. Further, these actions by Defendants deprived the **Parent Plaintiffs** of the right to protect their children from the active shooter and to aid and comfort one or more of the **Child Plaintiffs**.

405. As a direct and proximate result of these police actions, Plaintiffs sustained the damages hereinafter alleged.

### VII. THIRD CAUSE OF ACTION: ALL PLAINTIFFS AGAINST TXDPS DEFENDANTS AND INDIVIDUAL UCISD-PD DEFENDANTS, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AMENDMENT, UNLAWFUL SEIZURE)

406. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

407. By using force and authority to involuntarily confine students and teachers inside Classrooms 111 and 112 with the active Shooter, the **TXDPS Defendants** and individual **UCISD-PD Defendants** seized the **Child Plaintiffs**, in violation of clearly established rights secured to them by the Fourth and Fourteenth Amendments.

408. Each of these Defendants was deliberately indifferent to the rights of the **Child Plaintiffs** and the rights of the **Parent Plaintiffs**.

409. As a direct and proximate result of the misconduct of these Defendants as described herein, the Plaintiffs sustained the damages hereinafter alleged.

### VIII. FOURTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANTS ARREDONDO AND SUAREZ IN THEIR OFFICIAL CAPACITIES AND UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO ENSURE COMPLIANCE WITH UNIVERSALLY ACCEPTED STANDARDS)

410. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

411.   **Defendant Arredondo** in his official capacity, **Defendant Suarez**, and **Defendant UCISD** are hereafter referred to as "the **Policy-Making Uvalde Defendants**."

412.   Despite clear national standards for active shooter incidents, the **Policy-Making Uvalde Defendants** failed to ensure that their officers complied with these standards.  This failure demonstrated deliberate indifference to the Fourth and Fourteenth Amendment rights of students and teachers who would be locked down during an active shooter event including the rights of Plaintiffs.

413.   The **Policy-Making Uvalde Defendants** failed to adequately ensure that the individual **UCISD-PD Defendants** would properly identify and respond to an active shooter incident. The result was that individual **UCISD-PD Defendants** and **TXDPS Defendants** violated the clearly established rights secured to them by the Fourth and Fourteenth Amendments as previously alleged.

414.   **Defendant Arredondo**, as Chief of Police for the UCISD-PD, was a final policymaker for the **UCISD** with regard to the tactics, arrests, and training of UCISD-PD officers at all relevant times herein.

415.   **Defendant Arredondo**, acting as final policymaker, adopted an on-scene policy that was the exact opposite of "stop the killing and then stop the dying" and all other written active shooter policies. His policy was to confine the **Child Plaintiffs**, and other students and teachers inside two classrooms with the Shooter, depriving them of emergency medical care and preventing rescue by their loved ones.

416.   By virtue of any and all of these actions and omissions, the **Policy-Making Uvalde Defendants** were deliberately indifferent to the constitutional rights of the **Child Plaintiffs**.

417.    As a direct and proximate result of these actions and inactions, Plaintiffs sustained the damages alleged herein.

### IX.    FIFTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST DEFENDANTS ARREDONDO AND SUAREZ IN THEIR OFFICIAL CAPACITIES AND UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, VIOLATION OF 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO ENSURE COMPLIANCE WITH UNIVERSALLY ACCEPTED STANDARDS)

418.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

419.    The **Policy-Making Uvalde Defendants** failed to adequately ensure that the individual **UCISD-PD Defendants** would properly identify and respond to an active shooter incident.  The result was that law enforcement officers employed by **Policy-Making Uvalde Defendants** confined the **Child Plaintiffs** with the Shooter and illegally created a dangerous environment for the **Child Plaintiffs**, as previously alleged. Further, the **Child Plaintiffs** were in the custody of law enforcement officers, as previously alleged.

420.    **Defendant Arredondo**, acting as final policymaker, adopted a policy of confining the Child Plaintiffs with the active shooter and increasing the danger to them as previously alleged.

421.    By virtue of these actions and omissions, the **Policy-Making Uvalde Defendants** were deliberately indifferent to the constitutional rights of the **Child Plaintiffs**.

422.    As a direct and proximate result of these actions, omissions and policies, the **Child Plaintiffs** sustained the damages alleged herein.

### X.    SIXTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – FAILURE TO WARN

423.    Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

424.     Plaintiffs bring this strict liability claim against **Defendant Motorola** for failure to warn of the dangers and risks associated with use of its products.

425.     **Motorola's** products were defective and unreasonably dangerous because they did not contain adequate warnings or instructions concerning failure during normal use. These actions were under the ultimate control and supervision of **Motorola**.

426.     **Motorola's** products are used for public safety and in public settings and **Motorola** had a duty to warn of the risks of failure associated with the reasonably foreseeable use of the products and a duty to instruct on the proper and safe use of these products.

427.     At all relevant times, **Motorola** had a duty to properly research, test, develop, manufacture, inspect, label, market, promote, provide proper warnings, and take such steps as necessary to ensure that its products did not fail during an emergency causing others to suffer unreasonable and dangerous risks and harm. **Motorola** had a continuing duty to instruct on the proper, safe use of these products, especially given that the products were used by schools and first responders. **Motorola**, as the designer, manufacturer, seller, or distributor, is held to the knowledge of an expert in the field.

428.     **Motorola** could have provided warnings or instructions regarding the full and complete risks of its products because it knew or should have known of the unreasonable risks of harm associated with the use of products and/or failure during use.

429.     **Motorola** failed to properly investigate, study, research, test, manufacture, and label their products and failed to minimize the dangers to others due to product failures. **Motorola** knew failing to do so would be catastrophic and prevent schools and first responders from protecting victims such as the **Child Plaintiffs** during an attack.

77

430.   **Motorola's** products reached its intended users without substantial change in their condition as designed, manufactured, sold, distributed, labeled, implemented, and sold by Motorola.

431.   As a result of **Motorola's** failures to warn, Motorola's products were defective and unreasonably dangerous when they left the possession and/or control of **Motorola** and were used by its consumers on the day of the school shooting. That defect was a producing cause of the injuries made the basis of this suit.

432.   **Motorola** is liable for the physical harms caused in this case, and Plaintiffs plead for all of their damages as set forth below.

## XI.   SEVENTH CAUSE OF ACTION: ALL PLAINTIFFS AGAINST MOTOROLA SOLUTIONS, INC., PRODUCTS LIABILITY – MANUFACTURING DEFECT

433.   Plaintiffs reallege and incorporate each of the preceding paragraphs, and all subsequent paragraphs.

434.   Plaintiffs bring this strict liability claim against **Motorola** for manufacturing defect.

435.   At all relevant times, **Motorola** researched, tested, developed, manufactured, marketed, sold and/or installed communications, radio, and security systems used for safety.

436.   **Motorola's** products, however, deviated in their construction or quality from the specifications or planned output in a manner that rendered them unreasonably dangerous. This defect rendered **Motorola's** products inoperable and/or ineffective in the life-or-death emergency at Robb Elementary School on May 24, 2022. This made **Motorola** products unusable and therefore dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics.  The above manufacturing defect was a producing cause of the injuries made the basis of this suit.

78

437.   Based on information and belief, **Motorola's** products were defective and unreasonably dangerous because they failed during normal use and when used as intended. **Motorola's** systems and devices failed inside the school building leaving first responders without information communicated from dispatch and/or other first responders.

438.   **Motorola** is liable to Plaintiffs for injuries caused as a result of its products' manufacturing defects.

439.   The products' defects were substantial and a producing cause of Plaintiffs' injuries.

440.   **Motorola** is liable for the physical harms caused in this case, and Plaintiffs plead for all of their damages as set forth below.

## XII.   DAMAGES

441.   As a result of the causes of action above, these Plaintiffs – as well as their whole community – have suffered a degree of loss, pain, anguish, and destruction of their lives beyond understanding. For each of those causes of actions, Plaintiffs seek all available damages at law, including the following:

### A.   SURVIVAL DAMAGES OF DECEASED CHILDREN

442.   Pursuant to Texas Civil Practice and Remedies Code § 71.021, Plaintiffs plead for their funeral and burial expenses. They plead as well for the pain and mental anguish for each of the children that lost their lives. This plea includes damages for the conscious physical pain and emotional pain from injuries, the torment and anguish of the fear of impending death, and the suffering for each of the following minor decedents:

a.   **J.J.C.;**

b.   **A.J.G.;**

c.   **M.Y.R.;**

d.   **T.M.M.;**

79

e.  **A.G.R.;**

f.  **M.G.M.;**

g.  **N.A.B.;**

h.  **J.N.S.;**

i.  **M.L.E.;**

j.  **A.A.R.;**

k.  **J.C.L.;**

l.  **E.A.G.;**

m.  **J.M.F.;**

n.  **R.F.T.;**

o.  **U.S.G.;**

p.  **E.T.;** and

q.  **L.M.S.**

**B.    WRONGFUL DEATH BENEFICIARY DAMAGES OF SURVIVING PARENTS**

443.    Pursuant to Texas Civil Practice and Remedies Code § 71.002, each of the surviving natural parents of these above deceased children are wrongful death beneficiaries asserting claims arising out of the death of their children proximately caused by the foregoing claims. As such, each of the parents below asserts claims for all recoverable damages as wrongful death beneficiaries, including the following claims:

a.  Pecuniary loss sustained in the past for the loss of the care, maintenance, support, services, advise, counsel, and reasonable contributions of a pecuniary value that each parent in all reasonable probability would have received from their deceased child had he or she lived;

b.     Pecuniary loss that, in reasonable probability, will be sustained in the future;

c.     Loss of companionship and society in the past for the loss of the positive benefits flowing from the love, comfort, companionship, and society that each parent in all reasonable probability would have received from their deceased child had he or she lived;

d.     Loss of companionship and society that, in reasonable probability, will be sustained in the future;

e.     Mental anguish sustained in the past for the emotional pain, torment, and suffering experienced by each parent for the death of their child; and

f.     Mental anguish that, in all reasonable probability, will be sustained in the future.

444.     Each of the above elements of wrongful death damages is being sought by each of the following natural parents of their child decedents:

a.     **Javier Cazares** (parent of **J.J.C.**);

b.     **Santa Gloria Cazares** (parent of **J.J.C.**);

c.     **Kimberly Garcia** (parent of **A.J.G.**);

d.     **Ana Rodriguez** (parent of **M.Y.R.**);

e.     **Jerry Mata** (parent of **T.M.M.**);

f.     **Veronica Mata** (parent of **T.M.M.**);

g.     **Jessie Rodriguez** (parent of **A.G.R.**);

h.     **Deanna Gornto** (parent of **M.G.M.**);

i.     **Maria Magadelene Garcia** (parent of **N.A.B.**);

j.     **Juan Julian Bravo** (parent of **N.A.B.**);

k.     **Veronica Luevanos** (parent of **J.N.S.**);

81

l.      **Jacob Silguero** (parent of **J.N.S.**);

m.      **April Elrod** (parent of **M.L.E.**);

n.      **Kimberly Rubio** (parent of **A.A.R.**);

o.      **Felix Rubio** (parent of **A.A.R.**);

p.      **Jose Luevanos** (parent of **J.C.L.**);

q.      **Christina Luevanos** (parent of **J.C.L.**);

r.      **Jennifer Lugo** (parent of **E.A.G.**);

s.      **Steven Garcia** (parent of **E.A.G.**);

t.      **Alyssa Rodriguez** (parent of **J.M.F.**);

u.      **Evadulia Orta** (parent of **R.F.T.**);

v.      **Mandy Marie Renfro** (parent of **U.S.G.**);

w.      **Eli Torres** (parent of **E.T.**);

x.      **Vincent Salazar, III** (parent of **L.M.S.**); and

y.      **Melinda Alejandro** (parent of **L.M.S.**).

## C.      PERSONAL INJURY DAMAGES ARISING OUT OF THE INJURIES TO M.I.C. AND A.J.M.

445.    Both **Plaintiffs M.I.C.** and **A.J.M.** are children who survived the shooting. They will carry with them for the rest of their lives the physical and emotional scars of what happened that day. For these injuries, **Plaintiffs Miguel Cerrillo** and **Abigale Veloz** plead as next friends for damages suffered by **M.I.C.** for pain and suffering, mental anguish, and loss of enjoyment of life sustained in the past and in the future, as well as a claim for exemplary damages. **Miguel** and **Abigale** also assert claims as bystanders for their own mental anguish damages.

446.    Likewise, **Plaintiffs Jose Martinez** and **Kassandra Chavez** plead as next friends for damages suffered by **A.J.M.** for pain and suffering, mental anguish, and loss of enjoyment of

life sustained in the past and in the future, as well as a claim for exemplary damages. **Jose** and **Kassandra** also assert claims as bystanders for their own mental anguish damages.

## XIII.   PUNITIVE AND EXEMPLARY DAMAGES

447.   Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

448.   Each Defendant's conduct was done with reckless disregard and/or callous indifference to the federally protected rights of others impacted by the shooting and subsequent conduct of law enforcement agents at the scene on May 24, 2022.

449.   Defendants, and each of them, were objectively and subjectively aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such risks were compounded and made worse by their inaction. With full knowledge of such risks, Defendants proceeded and caused Plaintiffs to suffer grave, even terminal, physical and mental harm.

## XIV.   DEMAND FOR A JURY TRIAL

450.   The Plaintiffs respectfully demand a trial by jury.

## XV.   RELIEF SOUGHT

451.   Wherefore, Plaintiffs respectfully request that the Court enter Judgment as follows:

a.   For compensatory economic damages in an amount to be determined by the trier of facts in the minimum amount of $500,000,000.

b.   For an award of such punitive and exemplary damages in an amount to be determined by the trier of facts.

c.   For an award of reasonable attorney's fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and their subdivisions.

83

d.   For costs of suit and pre and post–judgment interest as permitted by law.

e.   All other appropriate relief.

DATED: JULY 8, 2024

Respectfully submitted,

**THE PLAINTIFFS**,

By:   _____

Erin Rogiers, Esq.
TX State Bar No. 24083597
Francisco Guerra IV, Esq.
TX State Bar No. 00796684
Bailey Vannatta, Esq.
TX State Bar No. 24119113
GUERRA LLP
875 East Ashby Place, Suite 1200
San Antonio, TX 78212
Tel: (210) 447-0500
Fax: (210) 447-0501
erogiers@guerrallp.com
fguerra@guerrallp.com
bvannatta@guerrallp.com

By:   _____

Alinor C. Sterling, Esq. (*pro hac vice* forthcoming)
CT State Bar No. 411754
Joshua D. Koskoff, Esq. (*pro hac vice* forthcoming)
CT State Bar No. 410518
Colin S. Antaya, Esq. (*pro hac vice* forthcoming)
CT State Bar No. 440953
Katherine Mesner-Hage, Esq. (*pro hac vice* forthcoming)
CT State Bar No. 436299
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
asterling@koskoff.com
jkoskoff@koskoff.com
cantaya@koskoff.com
kmesnerhage@koskoff.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2024, I traditionally filed the foregoing

document with the Clerk of Court.

I further certify that this First Amended Complaint will be served on counsel for the

following defendants in accordance with Fed. R. Civ. P. 5 either by mail or by email:

**Counsel for Juan Maldonado, Crimson Elizondo, Richard Bogdanski, Luke Williams, Christopher Kindell, Joel Betancourt, and Victor Escalon:**
Christopher L. Lindsey
Office of the Texas Attorney General
P.O. Box 12548
Wm. P. Clements Bldg., 7th Floor
Austin, TX 78711-2548
(512) 463-2080
Fax: 512/370-9314
Email: christopher.lindsey@oag.texas.gov

**Counsel for Defendant Uvalde Consolidated Independent School District:**
Katie E. Payne
Walsh Gallegos Trevino Kyle & Robinson P.C.
1020 NE Loop 410, Suite 450
San Antonio, TX 78209
(210) 979-6633
Fax: 210-979-7024
Email: kpayne@wabsa.com

**Counsel for Mandy Gutierrez:**
Amy D. Demmler
Clay T. Grover
Rogers Morris & Grover LLP
5718 Westheimer
Suite 1200
Houston, TX 77057
713-960-6000
Fax: 713-960-6025
Email: ademmler@rmgllp.com
Email: cgrover@rmgllp.com

**Counsel for Pedro "Pete" Arredondo:**
Thomas Phillip Brandt
Christopher D. Livingston
Laura Dahl O'Leary

85

Fanning, Harper, Martinson, Brandt & Kutchin, P.C.
One Glen Lakes
8140 Walnut Hill Lane, Suite 200
Dallas, TX 75231
214-369-1300
Email: tbrandt@fhmbk.com
Email: clivingston@fhmbk.com
Email: loleary@fhmbk.com

**Counsel for Adrian Gonzales:**
James E. Byrom
Thompson & Horton, L.L.P.
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, TX 77027
713-554-6767
Fax: 713-583-8884
Email: jbyrom@thompsonhorton.com

**Counsel for Defendant Jesus "JJ" Suarez:**
James E. Byrom
Thompson & Horton, L.L.P.
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, TX 77027
713-554-6767
Fax: 713-583-8884
Email: jbyrom@thompsonhorton.com

**Counsel for Motorola Solutions, Inc.:**
Peter D. Laun
Jones Day
2727 North Harwood Street
Dallas, TX 75201
214-969-4530
Fax: 214-969-5100
Email: pdlaun@jonesday.com

I further certify that this First Amended Complaint and newly issued summons will be

served on the following defendants in this action in the manner required by Fed. R. Civ. P. 4.

Randy Garcia
Robert Smith
Jerry Simpson
Noe Fernandez

86

Erin Rogiers, Esq.
Attorney for the Plaintiffs